BRISCOE, Chief Judge.
A jury convicted Defendant Nathan Ar-chuleta of possession of methamphetamine, possession of methamphetamine with intent to distribute, conspiracy to possess methamphetamine with intent to distribute, and being a felon in possession of a firearm. On appeal, Archuleta contends that admission of a gang expert’s testimony violated Federal Rules of Evidence 403, 702, and 704(b). Of the three evidentiary rules now cited, only Rule 408 was raised by Archuleta before the district court. As a result, our review of his arguments pertaining to Rule 702 and Rule 704(b) is limited to plain error review. We have jurisdiction under 28 U.S.C. § 1291 and affirm.
I

Factual Background

Archuleta was a leader of the Tortilla Flats gang in Farmington, New Mexico. The Tortilla Flats are an affiliate of the Sureños, a group of gangs with ties to the Mexican Mafia gang. In June 2009, Ar-chuleta orchestrated a plan to smuggle methamphetamine from Mexico into the United States using two female accom *1291 plices as mules. The two females were Christine Roberts and Candi Ramirez. Also involved was Candi’s brother, Adam Ramirez, a friend and lower-ranking “colleague” of Archuleta in the Tortilla Flats.
On July 2, 2009, the group put the plan into action. They drove from Albuquerque to Las Cruces, New Mexico, where they met with Daniel Muñoz, a leader of a Las Cruces Sureño gang. In Muñoz’s apartment, Archuleta, Adam Ramirez, and Mu-ñoz discussed their drug-smuggling scheme. Roberts and Candi Ramirez were then dispatched to Mexico, along with their guide, Jose de la Luz Verdugo. They drove Adam Ramirez’s car across the border and picked up the drugs. But on their way back, border patrol officers discovered the drugs and arrested the three of them. Later, Adam Ramirez was arrested. And after a few months on the lam, Archuleta, too, was arrested. Three of Archuleta’s coconspirators — Adam, Can-di, and Christine Roberts — had turned on him, implicating him in the drug-smuggling scheme.

Procedural Background

On July 22, 2010, a grand jury issued an eight-count superseding indictment charging Archuleta and Muñoz. Archuleta was charged with these six of the eight counts: (Count 1) conspiracy to possess 50 grams and more of methamphetamine with intent to distribute on July 2 and 3, 2009, in violation of 21 U.S.C. § 846; (Count 2) possession of 50 grams and more of methamphetamine with intent to distribute on July 2, 2009, in violation of 21 U.S.C. § 841; (Count 4) conspiracy to possess methamphetamine with intent to distribute from June 1, 2009, to November 5, 2009, in violation of 21 U.S.C. § 846; (Count 5) felon in possession of a firearm on November 5, 2009, in violation of 18 U.S.C. §§ 922, 924; (Count 6) carrying a firearm during the commission of count 4 conspiracy to possess,, in violation of 18 U.S.C. § 924; and, (Count 7) possession of methamphetamine on November 5, 2009, in violation of 21 U.S.C. § 844(a).
Before trial, Archuleta filed a motion in limine seeking to exclude gang-affiliation expert testimony. He argued that any expert testimony based on hearsay violated Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), but conceded that “[t]he Government is free to seek to establish gang membership by non-hearsay evidence such as graffiti or tattoos.” R. Vol. 1, at 20-21. Archuleta’s motion also argued that gang experts generally had “no reliable data” on which to base their opinions. Id. at 22. He was careful to note, however, that he was not challenging “any part of the expert’s opinion that may be based on the expert’s own investigation or information from other law enforcement sources.” Id. at 21 n. 1.
A couple months later, the government filed notice that it would proffer Paul Lu-jan as an expert on gangs. Lujan was an officer vrith the gang unit of the Las Cruces, New Mexico Police Department, and the government stated that he would testify regarding the background, structure, and identifying tattoos of the Sure-ños. More generally, the government asserted that his testimony would assist the jury in understanding the relationships of the parties and in determining the existence of a conspiracy.
The district court held the first of two expert witness hearings on August 3, 2010, during which Lujan testified as to his credentials. , The court was satisfied that Lu-jan had specialized knowledge of the Sure-ños, and concluded sufficient foundation had been laid to permit him to testify as an expert. But the court was uncertain whether the danger of unfair prejudice from Lujan’s testimony substantially out *1292 weighed its probative value. And so the government was ordered to produce additional material for the court’s review.
The second hearing was held two days later. After reviewing additional evidence on the connection between the Sureños and the charged crimes, the district court concluded that the “Sureño affiliation, association, is significant in terms of the ... conspiracy,” because witnesses would testify that Archuleta was a “high-ranking member[ ] of the gang.” R. Vol. 3, pt. 13, at 2001-02. Accordingly, the court ruled that Lujan could testify “about the Sure-ños, the significance of the tattoos, the Tortilla Flats thing, all of that, as it relates to the July 2[] incident.” Id. at 2002. Archuleta objected to Lujan’s testimony as irrelevant and prejudicial, and the court overruled his objection.
At trial, Archuleta again objected, insisting that Lujan did not qualify as a gang expert and that gang testimony was irrelevant. Again, the district court overruled the objection. Lujan proceeded to testify about the Sureños’ history, colors, tattoos, structure, activities, and affiliation with the Mexican Mafia. When shown photographs of Archuleta’s tattoos, Lujan testified that those tattoos identified the person in the photographs as a member of the Tortilla Flats Sureño gang.
On August 16, 2010, after a six-day trial, the jury found Archuleta guilty of counts 1, 2, 5, and 7, and not guilty of counts 4 and 6. On January 12, 2012, the court sentenced Archuleta to 360 months’ imprisonment on counts 1 and 2, 120 months’ imprisonment on count 5, and 12 months’ imprisonment on count 7. All sentences were to be served concurrently.
II
On appeal, Archuleta contends that admission of Lujan’s testimony violated Federal Rules of Evidence 403, 702, and 704(b).

Rule 403

Archuleta argues that Lujan’s testimony was needlessly cumulative, confusing, misleading, and unfairly prejudicial. Generally, relevant evidence is admissible at trial. Fed.R.Evid. 402. Rule 403, however, permits a court to “exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.” Fed. R.Evid. 403. We review for abuse of discretion a properly-preserved Rule 403 objection to the district court’s decision to admit evidence. United States v. McGlothin, 705 F.3d 1254, 1260 (10th Cir.2013). “Our abuse of discretion review affords the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues.” United States v. MacKay, 715 F.3d 807, 839 (10th Cir.2013) (internal quotation marks omitted).
First, Archuleta argues that Lujan’s testimony was needlessly cumulative because Adam Ramirez’s testimony covered the same information. During his testimony, Adam Ramirez described the Sureños’ tattoos, structure, and purpose, as well as Archuleta’s involvement in the Tortilla Flats. To be sure, Lujan covered some of the same ground. But not only did Lujan provide more detail than Adam Ramirez did on several subjects, Lujan also testified about subjects Adam Ramirez never mentioned, like the Sureños’ origins and history. Simply put, Lujan’s testimony was not a total repeat of Adam Ramirez’s testimony, and Archuleta does *1293 not explain how its admission was an abuse of discretion on this ground. See United States v. Edwards, 540 F.3d 1156, 1162-63 (10th Cir.2008) (holding that five recordings of emergency 911 calls were not cumulative evidence). Thus, we conclude that the district court did not abuse its discretion in refusing to exclude Lujan’s testimony as cumulative.
Second, Archuleta insists that Lujan’s testimony was confusing and misleading. According to him, the history of the Sureños had “little or nothing to do” with his charges, and that the testimony “suggested] to the jury that the drug-smuggling scheme was somehow in fact linked to the Mexican Mafia.” Aplt. Br. at 26-27. We disagree. As we explain in more detail below, Archuleta was in a Sureño gang, therefore testimony concerning the Sureños’ origins and activities was relevant in explaining Archuleta’s activities as a member and, indeed, as a leader. And there was a low risk that such straightforward testimony would mislead the jury into thinking that Archuleta acted on behalf of the Mexican Mafia. This risk did not substantially outweigh the testimony’s probative value, and thus, the district court did not abuse its discretion in rejecting Archuleta’s assertion that Lujan’s testimony was confusing and misleading.
Finally, Archuleta’s main focus and concern is whether he was unfairly prejudiced by the admission of Lujan’s testimony. As we have explained, unfair prejudice must do more than simply harm a defendant’s case. United States v. Irving, 665 F.3d 1184, 1213-14 (10th Cir.2011). Virtually all relevant evidence is prejudicial to one side or the other. Evidence becomes unfairly prejudicial, however, when it “makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury’s attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.” Id. (alterations omitted) (internal quotation marks omitted). But even where unfair prejudice is found, “it must substantially outweigh the probative value of the evidence in order to be excluded under Rule 403.” Id. at 1214 (emphasis omitted).
According to Archuleta, Lujan’s “repeated references to drive-by shootings, kidnappings, and stabbings allegedly committed by unnamed Sureños, and to the genéral crime wave in Las Cruces the gang had caused” were unfairly prejudicial. Aplt. Br. at 26. The dissent agrees that unfair prejudice was likely, noting Lujan’s “lurid snapshot of the history and habits of the Sureños,” as well as his “repetitive references to home invasions, drive-by shootings, kidnappings, burglaries, and beatings allegedly committed by them.” Dissent at 1301. According to the dissent, none of this “information was [ ] in any way useful in helping the jury understand the other testimony in the case or in determining the facts at issue.” Id. The dissent also finds objectionable Lujan’s description of the Sureños’ “violent initiation ceremonies” and “draconian methods of imposing internal order and discipline among their membership,” concluding that “[n]ot a word of this line of testimony was probative of anything at issue in Mr. Ar-chuleta’s trial.” Id. at 1302. It appears that the dissent urges not only that Lu-jan’s testimony was unfairly prejudicial, but also that it was irrelevant.
We disagree that Lujan’s testimony was irrelevant. At the outset, we note that we have ruled in prior cases where conspiracy is charged that gang-affiliation testimony may be relevant. See, e.g., United States v. Brown, 200 F.3d 700, 708 (10th Cir.1999) (allowing gang-affiliation evidence as evidence of conspiracy); Unit *1294 ed States v. Sloan, 65 F.3d 149, 151 (10th Cir.1995) (permitting use of “gang activity” evidence “to prove the existence of a conspiracy and to show the basis of the relationship between the defendant and witnesses who participated in the drug distribution operation”); United States v. Robinson, 978 F.2d 1554, 1564 (10th Cir.1992) (affirming admission of gang-expert testimony because “associational evidence may be directly relevant on the issues of formation, agreement and purpose of a conspiracy”); United States v. Silverstein, 737 F.2d 864, 866 (10th Cir.1984) (allowing gang-affiliation testimony when defendant was affiliated with Aryan Brotherhood).
More to the point, though, a pillar of the defense’s case was testimony' designed to negate the image of Archuleta as a gang leader capable of commanding subordinates, and instead to paint the Tortilla Flats as “just a group of friends” who only got together to “hang out.” See, e.g., Trial Tr. Vol V, at 135, 137. For example, the defense put Alex Wenger on the stand to testify about his time as a member of the Tortilla Flats, and he testified that there were no “mandatory meetings,” “[njobody organized anything,” and “[njobody told [people what] to do or anything like that”; this Sureño gang was “just a group that gets together, plays video games and drinks beer.” Id. at 135, 139. When asked about the gang’s “hierarchy,” he testified that “there were no leaders in th[e] gang, [and] everyone was equal.” Id. at 142. Indeed, Wenger testified that if Archuleta ever “told [him] to do something,” he would not “automatically do it,” and that Archuleta never “threatened to kill [him] or to beat [him] if [he] didn’t follow his direct order.” Id. at 136.
When Archuleta took the stand, he echoed the same theme. He testified that the Tortilla Flats imposed “no obligations” on its members, explaining that “it’s not like [a member] can’t move away or ... can’t go do what [he] want[s] to do.... That’s not the purpose of the gang, to control or to do anything like that.... I considered it more like a family.” Id. at 163. In fact, he testified that the gang “never did anything to make money together.” Id. at 263. And on the issue of his authority in the gang, he testified that “[w]e don’t really have no roles or anything like that,” and that “[n]obody is greater than the next person.” Id. at 231-32; see also Trial Tr. Vol. VI, at 12 (“There’s no rank or regulations or anything like that for any of us.”).
The implication of this testimony and of the defense’s case-in-chief was unmistakable: Although Archuleta’s alleged cocon-spirators claimed that their crimes on July 2 were the product of their fearful submission to Archuleta’s commands and implicit threats, in fact those alleged coconspira-tors were always free to do as they wished, and so they must have acted on their own initiative in this case as well. Indeed, if the Tortilla Flats were “just a group that gets together, plays video games and drinks beer,” then it would be unlikely that Archuleta would have known that his companions intended to smuggle drugs across the border.
The prosecution offered two logical, relevant counters to the image of Archuleta and his Sureño gang as portrayed by the defense. First, the prosecution presented testimony from the coconspirators characterizing Archuleta as a threatening authority figure- who orchestrated the drug smuggling scheme. Second, the prosecution presented testimony from Lujan describing the typical Sureño gang as operating with a rigid hierarchy, in which leaders give orders to engage in illegal activity and, under threat of violence, subordinates obey those orders. The logic behind offering Lujan’s testimony was simple: If the coconspirators’ description of the events *1295 leading up to and on July 2 is consistent with the typical operation of a Sureño gang, then it is more likely that the cocon-spirators testified truthfully. And so, Lu-jan’s testimony was directly relevant to evaluating critical testimony regarding the relationship of the parties, and the genesis, terms, and purpose of the conspiracy.
More plausible is the contention that Lujan’s testimony was unfairly prejudicial. The dissent points to passages of Lujan’s testimony in which he listed a series of crimes allegedly committed by Sureños, including “home invasions, drive-by shootings, burglaries, and beatings,” Dissent at 1301, as well as the Sureños’ “violent initiation ceremonies,” “draconian methods of imposing internal order and discipline among their membership,” and “ruthlessness in dealing with informants,” id. at 1302. The unfair prejudice from this testimony, according to Archuleta and the dissent, substantially outweighed the testimony’s probative value.[1]
When viewed in context, however, we are unpersuaded that the district court abused its discretion in refusing to exclude Lujan’s testimony as unfairly prejudicial. Any unfairness from gang-affiliation testimony stems from the implicit connection the expert draws between the crimes committed by gangs and the defendant gang member. In most cases, concern about such innuendo would be proper, because ordinarily the jury should not assume that the defendant gang member committed the crimes detailed by the expert. Here, however, Archuleta took the stand and catalogued his personal involvement in virtually every crime the dissent lists. During his testimony, Archuleta admitted that he had broken into a home and robbed it, that he and the Tortilla Flats were involved in attacks, shootings, and other crimes, that he had stolen a car while armed with multiple guns and knives, that he had physically assaulted both police officers and private citizens, and that he had been involved in many violent initiation ceremonies. Thus, to the extent there is a concern that the jury might have heard Lujan’s testimony and linked Ar-chuleta to those crimes, we think that Ar-chuleta pretty well took care of that himself.
Even so, the dissent insists, Lujan’s testimony prejudiced Archuleta by so harming Archuleta’s moral standing in the jury’s eyes that the jury convicted him for being a bad person. Unlike the dissent, however, we are dubious that the jury’s regard for Archuleta was susceptible of decrease. Even putting aside the hours of damning testimony from his coconspira-tors, Archuleta made a remarkable series of admissions during his own testimony. In addition to taking credit for the crimes we have already listed, Archuleta described himself as a habitual drug-using felon who had repeatedly violated his parole, been on the run from the police on multiple occasions, stolen deadly weapons from a home, been a womanizer who “didn’t care ... about [his sexual partner’s] feelings, whatsoever,” Trial Tr. Vol VI, at 59, zip-tied a woman’s hands and feet behind her, spit at a police officer while so drunk and disorderly as to require mace to be subdued, run over a dog during a high-speed chase, threatened to murder a host of police officers, and, when *1296 asked whether he had ever used throwing knives or throwing stars against another human being, answered “[n]o,” because “they’re not going to stick real good in anybody.” Trial Tr. Vol V, at 213.
And in spite of all this testimony, during which Archuleta meticulously assassinated his own character, the jury still parsed the conspiracy charges, finding Archuleta guilty on count 1 but not guilty on count 4. In the end, the jury’s verdict appears to be based on reason, rather than emotion. Therefore, even if the district court abused its discretion in admitting Lujan’s testimony, we are convinced that the error was harmless. See United States v. Resendiz-Patino, 420 F.3d 1177, 1181 (10th Cir.2005) (“A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect.”). The independent evidence of both the gang’s activities and Archuleta’s involvement in the gang was overwhelming. When the trial testimony is reviewed as a whole, Lujan’s testimony did not have a substantial influence on the outcome of the trial.

Rule 702

Archuleta argues that “the operation of the Sureños gang was not so complicated that the jury needed an expert’s help to understand it.... Adam Ramirez’s testimony about the gang was sufficient.” Aplt. Br. at 27. Rule 702 requires a district court to “satisfy itself that the proposed expert testimony ... will assist the trier of fact, before permitting a jury to assess such testimony.” United States v. Rodriguez-Felix, 450 F.3d 1117, 1122 (10th Cir.2006). To determine whether the testimony will assist the trier of fact, courts look to “whether the testimony is relevant,” “within the juror’s common knowledge and experience,” and “whether it will usurp the juror’s role of evaluating a witness’s credibility.” Id. at 1123. Because Archuleta failed to raise this Rule 702 argument at trial, we review it now for plain error. See United States v. Garza, 566 F.3d 1194, 1200 (10th Cir.2009) (“[T]o preserve [a] claim of error, [a] party must object with specificity, articulating the precise ground for the objection.” (internal quotation marks omitted) (citing United States v. Winder, 557 F.3d 1129, 1136 (10th Cir.2009))). “Under the rigorous plain-error standard, a defendant has the burden of showing (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights.” United States v. Begaye, 635 F.3d 456, 470 (10th Cir.2011) (internal quotation marks omitted). “If he satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.” Id. (internal quotation marks omitted).
As we discussed earlier, Lujan covered many of the same subjects as did Adam Ramirez. But there were also differences. Unlike Adam Ramirez, Lujan testified about the broader context of the Sureños, including their origins and history. He even added details about the structure, purpose, and activities of the Sureños that Adam Ramirez never mentioned. The average juror is unlikely to be aware of those facts. See United States v. Garcia, 635 F.3d 472, 477 (10th Cir.2011) (affirming admission of expert testimony about firearm straw purchases because “[t]he average juror is as likely to be unaware of the dynamics of the illicit arms trade as of the trade in narcotics”). The evidence was relevant because Archuleta and two of his coconspirators were members of a Sureño gang, making such evidence probative of Archuleta’s conduct. *1297 And we have affirmed district courts’ admission of gang-expert testimony as helpful to a jury when a defendant is a gang member. See Robinson, 978 F.2d at 1564.
At bottom, Archuleta simply fails to explain how relevant evidence, which no other witness covered, was unhelpful to the jury’s understanding of the implications of his membership in the Tortilla Flats. See 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6265, at 250 (1997) (“[T]he ‘assist’ requirement is satisfied where expert testimony advances the trier of fact’s understanding to any degree.”). When Rule 702 is applied in the context of this trial, the district court did not commit plain error in admitting Lujan’s testimony to assist the jury in understanding the operation of a Sureño gang.

Rule 704(b)

Archuleta’s final argument is that Lujan’s testimony violated Rule 704(b) because it “was the functional equivalent of an opinion that Mr. Archuleta in fact had knowledge of the smuggling scheme.” Aplt. Br. at 28-29. Under Rule 704(b), “[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.” Fed.R.Evid. 704(b). We have interpreted the Rule as “prevent[ing] experts from expressly stating the final conclusion or inference as to a defendant’s mental state,” but “not preventing] the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state.” United States v. Goodman, 683 F.3d 968, 970 (10th Cir.2011) (internal quotation marks omitted). In short, the question is whether Lujan improperly testified about Archuleta’s mental state. Because Ar-chuleta failed to object at trial regarding any alleged violation of Rule 704(b), we review this issue for plain error.
Archuleta points to the following testimony from Lujan as violative of Rule 704(b):
Q. [I]s it possible for a lower ranking soldier, depending' on the circumstances, to go ahead and jump a capitán? • In other words, in order to leap over him and broker .the soldier’s own drug deal without capitán knowing?
A. No, there’s not. There’s no way. If something like that would happen, there would be severe penalties.
Q. ■ Could it happen?
A. It could happen, yes. But if the higher person found out about it, again there — the repercussions of that would come back.
Q. And if you altered it a little bit and I said, well, not just in any circumstance, but let’s say that there were two capi-tans [sic] in a tiny apartment and a soldier as well, do you think it would be possible in that situation for the soldier to broker a deal without the capitán knowing?
A. No, because I think the intimidation factor is there already. You have two leaders and somebody that’s lower ranking that’s not going to jump ship to go broker or something — do something on his own without approval from his superiors.
R. Vol. 3, pt. 10, at 1461-62. Archuleta asserts that through this testimony “the government did indirectly what it was prohibited from doing directly.” Aplt. Br. at 29. Put another way, he contends that the government cloaked in hypothetical the question of whether Archuleta had knowledge of the drug-smuggling conspiracy.
*1298 He has a point. An expert could properly testify to “facts or opinions from which the jury could conclude or infer” that Archuleta had knowledge of the conspiracy, see Goodman, 633 F.3d at 970, but that final inference is “for the trier of fact alone,” see Fed.R.Evid. 704(b). Lujan’s response to the hypothetical question posed probably crossed that line. The “altered” second hypothetical involved the same facts as in Archuleta’s case, and directly posed the question of whether a person-in Archuleta’s position could lack the requisite mens rea. Lujan definitively answered “No.”
• Even if Lujan’s testimony violated Rule 704(b), however, Archuleta cannot demonstrate plain error. This demanding standard requires him to show, among other things, “that the error must have affected the outcome of the district court’s proceedings.” United States v. Pablo, 696 F.3d 1280, 1293 (10th Cir.2012) (internal quotation marks omitted). But three of his coconspirators testified that Archuleta not only participated in the smuggling scheme but also orchestrated it.
For example, Roberts testified to the following facts. At some point prior to the trip to Las Cruces, Archuleta alerted her to the possibility that they would “go[ ] to Las Cruces and bring[] drugs back to Albuquerque.” R. Vol. 3, pt. 2, at 166. When the day of the trip came, and Ar-chuleta drove over to pick her up, he asked her, “Are you ready? We’re going to Las Cruces. We’re all about to get paid.” Id. at 167-68. When they arrived at Munoz’s apartment in Las Cruces, Archuleta and Muñoz met privately in a closed bathroom. When Archuleta came out, he told Roberts and Candi Ramirez that they must go to Mexico, and instructed them to “vacuum out the car very well” so that if, at “the checkpoint, a dog were to come and smell the car, [no] little weed stem or anything ... would ... attract [the] dog to the car.” Id. at 179-80, 183. Archuleta explained that he was sending Roberts and Candi Ramirez to Mexico because “it would look less suspicious if two females go.” Id. at 181-82. “[T]errified for [her] life,” Roberts complied. Id. at 181. During the drive, Roberts and Candi Ramirez were instructed by phone to “go to the movie theater in Deming to meet this person;” Id. at 188. They did so, and there they picked up their guide, Jose de la Luz Verdugo. They knew they were going to transport methamphetamine because they “were told by [Archuleta] that that’s what [they] were picking up.” Id. at 197. In short, Roberts testified that Archuleta had given the commands and that he had planned how the drug smuggling would take place. See, e.g., R. Vol. 3, pt. 3, at 251 (Roberts agreeing that “Archuleta planned the deal”).
For his part, Adam Ramirez expanded upon the extent to which Archuleta had played a primary role in orchestrating the plan. When Adam Ramirez learned that Archuleta had ordered Adam’s sister, Candi, “to go pick up drugs in Las Cruces,” Adam voiced his objection to Ar-chuleta, and said, “I don’t want nothing to do with it.” Id. at 349-51. But the decision was not Adam’s to make, rather it was Archuleta’s, who told Adam that his involvement was required. In Muñoz’s apartment, Archuleta and Muñoz had an argument about who was supposed to provide the vehicle for the drug smuggling. Archuleta told Muñoz, “I bring the girls.... [Yjou’re supposed to supply the ride.” Id. at 360. And then Archuleta resolved the issue by telling Adam, “Let us use your ride.” Id. at 361. Reluctantly, Adam consented. Echoing what Roberts had said, Adam Ramirez described Ar-chuleta as a leader of the conspiracy.
*1299 Likewise, Adam’s sister, Candi Ramirez, testified that Archuleta was central to the creation and oversight of the smuggling scheme. On the morning of the day they all drove to Las Cruces, Archuleta was at Candi’s house. It was there that Archule-ta asked Candi to “go down there and bring [drugs] back for him.” R. Vol. 3, pt. 4, at 475-76. At the time, Candi thought Archuleta wanted her to carry drugs from Las Cruces. Id. at 485. On the drive to Las Cruces, Adam drove, and Archuleta “would tell Adam where to go.” Id. at 482. And in Munoz’s apartment, after Archuleta told Roberts and- Candi to go to Mexico to pick up the drugs, he gave them money for gas, and told them to vacuum the car in order to avoid problems at the checkpoint. Id. at 485-86, 489.
All three of these coconspirators testified to Archuleta’s key role in the planning and execution of the conspiracy. Thus, even in the absence of the challenged response by Lujan to the hypothetical question, there was more than sufficient evidence presented to establish that Archuleta had knowledge, and in fact was key in the organization, of the drug-smuggling scheme. Archuleta has not shown how this testimony affected his substantial rights, and reversal on these grounds is not warranted under plain error review.
AFFIRMED.

. The cases cited by Archuleta on this point are all inapposite. See, e.g., United States v. McRae, 702 F.3d 806, 823, 828 (5th Cir.2012) (holding that a defendant should have been tried separately when there was no evidence that he was “in any way associated with the acts of his co-defendant[s]”); United States v. Parker, 71 M.J. 594, 610-11 (N.M.Ct.Crim.App.2012) (holding that evidence of defendant’s prior bad acts were improperly admitted under Rule 404(b)).