**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 14, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MELVIN ROSHARD ALFRED, a/k/a
King Maybach,

    Defendant - Appellant.

No. 19-1243

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CR-00463-PAB-1)**
_____

Kathleen Shen, Assistant Federal Public Defender (Virginia L. Grady, Federal Public
Defender and Grant R. Smith, Assistant Federal Public Defender, on the briefs), Denver,
Colorado, for Defendant-Appellant.

Elizabeth S. Ford Milani, Assistant United States Attorney (Jason R. Dunn, United States
Attorney, with her on the brief), Denver, Colorado, for Plaintiff-Appellee.
_____

Before **BRISCOE**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

    A jury convicted Melvin Roshard Alfred of coercion and enticement in

violation of 18 U.S.C. § 2422 (count 1) and facilitating prostitution in violation of 18

U.S.C. § 1952 (count 2). Using a social media website, "Tagged," Mr. Alfred attempted to convince a person he believed to be a nineteen-year-old woman living in Colorado to engage in prostitution. In fact, Mr. Alfred was communicating with FBI agents.

Before trial, the government indicated it intended to admit eight "memes"—pictures with text over them or pictures of text. Mr. Alfred had posted the memes on Tagged in or before 2015, three years prior to Mr. Alfred's contact with the FBI-run profile. The memes contained laudatory references to pimping and pimping culture and also contained graphic depictions suggesting dire consequences of engaging in prostitution without a pimp. The district court concluded the memes were admissible as intrinsic evidence of the crimes charged and that the probative value of six of the eight memes was not outweighed by the danger of unfair prejudice. The district court excluded the other two memes under Rule 403.

On appeal, Mr. Alfred argues the district court abused its discretion in finding the memes were intrinsic evidence of the charged counts and in finding the probative value of the six memes admitted was not outweighed by the danger of unfair prejudice. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

The charges here stem from Mr. Alfred's activities on Tagged, a social media website. Three aspects of Tagged are relevant: (1) users' ability to create profile pages; (2) users' ability to post images; and (3) users' ability to chat with one another. When

2

opening an account on Tagged, the user creates a profile page that contains a username, tagline, gender, age, relationship status, ethnicity, religion, and sexual orientation, as well as information relevant to the user's activity on the site. The profile page also contains two hyperlinks to a different page where photographs uploaded by the user, including memes, can be accessed. Users may be able to limit who can see their posts and photographs. Tagged also allows users to send messages to one another. After a user sets up a profile page, Tagged encourages communication by sharing other Tagged users' profiles.

Mr. Alfred went by the alias "King Maybach" on Tagged, and included a picture of a crown before "Maybach" on his profile page. Mr. Alfred's profile stated he was a straight, single, twenty-nine-year-old, Black, Christian male and included a picture of him. It also included the tagline "I like how it feels but it[']s better when it pays the bills." ROA, Vol. I at 100. During the investigation period, Mr. Alfred sent sixty-five Tagged users messages asking "What's good wit cha ma[?]"[1] ROA, Vol. IV at 716–17.

One of these accounts was a false profile with the screenname "G-Baby," that was created by law enforcement to target sex traffickers. Using photographs provided by a confidential source, G-Baby purported to be a nineteen-year-old woman in Colorado. The G-Baby account responded to Mr. Alfred's "What's good wit cha ma[?]" opening and the two chatted. Special Agent Craig Tangeman, the government agent controlling the

---

[1] The government states Mr. Alfred sent this message to sixty-five users in addition to the FBI-run profile, which would suggest he sent it to sixty-six users total. The record suggests it was sent to sixty-five users total.

account, looked over the King Maybach profile, including the memes at issue, shortly after initiating contact. G-Baby told King Maybach her name was "Nikki" and Agent Tangeman confirmed King Maybach was Mr. Alfred. "Nikki" claimed to be in a bad living situation with a former boyfriend and said she wanted to leave Denver. Mr. Alfred told "Nikki" he could help her become rich, improve her life, and achieve her goals.

Mr. Alfred encouraged "Nikki" to find a "trick"—a sex buyer—to obtain the funds to travel to Houston, Texas, where he lived. Agent Tangeman portrayed "Nikki" as concerned about engaging in prostitution and asked Mr. Alfred to explain its terminology. Mr. Alfred continued to push "Nikki" to engage in sex acts for money, explaining terms, pricing structure, and other elements of prostitution culture, and he gave her explicit guidance on the who, what, where, and how of meeting sex buyers.

A confidential source posing as "Nikki" ultimately called Mr. Alfred and told him she had engaged in a sex act for money and was able to purchase a bus ticket to Houston. Mr. Alfred agreed to meet "Nikki" at the bus station. Law enforcement was waiting at the bus station and arrested Mr. Alfred, who had a loaded gun with him as well as the cell phone he used to contact "Nikki."

## B. *Procedural History*

The government initially charged Mr. Alfred with attempted coercion and enticement in violation of 18 U.S.C. § 2422(a). It filed a notice indicating it would seek to admit memes posted on Mr. Alfred's Tagged page referencing pimping and prostitution under Federal Rule of Evidence 404(b)(2) as evidence of knowledge, intent, plan, and absence of mistake. However, the government filed a superseding indictment,

4

adding a second count: facilitating prostitution in violation of 18 U.S.C. § 1952(a)(3)(A). It then withdrew the notice to admit the memes under Federal Rule of Evidence 404(b)(2), arguing instead that the memes were intrinsic to both counts because they were evidence of Mr. Alfred's social media "brand." Mr. Alfred objected to the memes' admission, arguing both that they were not intrinsic evidence of the crimes and that even if they were, their probative value, if any, was outweighed by the risk of unfair prejudice.

The district court held a pretrial hearing on the admission of the memes. Because the court had an admitted unfamiliarity with social media, much of the hearing focused on the mechanics of how the site operated with respect to the memes posted by Mr. Alfred and what inferences could reasonably be drawn from his choice to leave the posts up. The government argued the memes remained accessible through Mr. Alfred's Tagged account during the relevant time period and were part of the "brand" he used to recruit sex workers. ROA, Vol. IV at 879–80. It also argued the memes were intrinsic to the enticement count because what was visible on Mr. Alfred's Tagged account was a part of his attempt to recruit Nikki. Mr. Alfred disagreed with the government's characterization. He argued the memes were "a historical record of things that he has thought and said and did and posted" from years prior that did not reflect his thinking during the relevant time period and that they were buried under three years of subsequent activity on Tagged. *Id.* at 866.

The district court referred to the memes being posted "to what I am going to call a landing page. . . . [I]t's not like this is a billboard, but this is what someone would see if Mr. Alfred had reached out to the person in an offer to communicate." *Id.* at 894–95.

5

However, the district court recognized that to view the photos a Tagged user would need only to click one of two links—"[s]o it does seem like there would be a very easy means by which to view photos that Mr. Alfred had made available on his profile page or landing page." *Id.* at 895. Although acknowledging the defense arguments about the historical nature of the memes, the district court held they were intrinsic:

> [T]hose memes were available and I find that they were readily available, the nature of the website readily available. And as a result, I find that in fact they are intrinsic because they are the types of things that can be easily seen. And at least under the government's theory about their relevance to Count 2, they would be evidence of his business enterprise, namely, that he is using those memes as displaying what he is about. And under the government's theory at least, what he is about is pimping.
>
> And that combined with other evidence where he is reaching out to various other people in what the government characterizes them as an attempt to solicit people, the fact that he is making those available on his landing page I believe make them intrinsic. So as a result, that aspect of the request to exclude them is denied.

*Id.* at 896–97.

Mr. Alfred moved to sever the two counts on the ground the memes were intrinsic only to the second count. The district court disagreed, stating: "I find that the memes at issue are intrinsic to Count One for the exact same reason. . . . I think that the nature of that landing page is such that it would be very easy and likely that a person would look through multiple photos." *Id.* at 904–05.

The district court, however, did exclude two of the memes under Federal Rule of Evidence 403. The first excluded meme depicts a woman's beaten face with the words "The face she makes when she realizes she need Pimping!!!" ROA, Vol. I at 113. The second shows a man kicking a woman off a cliff, with the words "No love for renegades"

6

and a website: "www.pimpthoughts.biz." *Id.* The district court concluded these two memes were susceptible to a high risk of misinterpretation because "there is a very, very high likelihood that the jury, especially those two images in combination, would believe that Mr. Alfred's message is that you get in line or you get beaten up." Vol. IV at 899–900. But as to the other six memes, the court determined they were intrinsic evidence of the crimes and their probative value was not outweighed by the risk of unfair prejudice.

During trial, the government referred to the memes three times: in its opening statement, during its examination of Agent Tangeman, and in its closing argument. Agent Tangeman's testimony featured the memes somewhat prominently, including informing the jury as to the meaning of terms used in them. He also testified about Mr. Alfred's interactions with "Nikki," including Mr. Alfred's instructions on how to find a trick and the terminology of prostitution. In addition to Agent Tangeman, the government called three witnesses: Houston Police Officer Stephen Poprik, Special Agent Theo Williams, and Special Agent Robert Spivey. Officer Poprik was a Houston police officer involved in arresting Mr. Alfred; Agent Williams was the coordinator for the Houston division of the FBI who arranged the arrest; and Agent Spivey coordinated the operation from the Denver FBI division. The defense called one witness, Eugeniia Sedova. Ms. Sedova met Mr. Alfred on Tagged and testified he advised her on job seeking without suggesting sex work.

The jury found Mr. Alfred guilty on both counts. The district court sentenced him to 21 months' imprisonment on each count, to run concurrently. The district court entered judgment on July 2, 2019, and Mr. Alfred timely filed a notice of appeal on July 8, 2019.

## II.    DISCUSSION

The question on appeal is whether the admission of the memes was barred by Federal Rules of Evidence 404(b)(1) and 403.[2] *See United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011) (noting evidence which is intrinsic and not barred by Rule 404(b)(1) may still be excluded under Rule 403). In admitting the memes, the district court found they were intrinsic evidence and thus not subject to Federal Rule of Evidence 404(b)(1), and that their probative value was not substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403. On appeal, Mr. Alfred argues they fail both tests.

"We review the admission of evidence for abuse of discretion and will not reverse if the district court's ruling falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical." *United States v. Durham*, 902 F.3d 1180, 1222 (10th Cir. 2018) (internal quotation marks omitted). "A district court abuses its discretion only where it (1) commits legal error, (2) relies

---

[2] At oral argument, counsel for Mr. Alfred suggested these challenges were aimed at all admitted memes. The government informed us it sought to admit "something like twenty memes." Oral Argument at 16:37–16:52. We read Mr. Alfred's opening brief to challenge only the six memes admitted at the pretrial hearing. *See* Appellant Br. at 16 ("[T]he government only sought to introduce eight memes that related to pimping."); *id.* at 19 ("The government moved to admit eight memes from Mr. Alfred's Tagged page. The district court ruled that all of these images were direct evidence of the charged crimes. However, the court excluded two of these images . . . . It should have excluded all of them."). Mr. Alfred's argument as to memes other than the six admitted pretrial is therefore waived. *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("[A] party's failure to address an issue in its opening brief results in that issue being deemed waived."). However, because Mr. Alfred's arguments on appeal apply equally to all admitted memes, our analysis would apply equally to those on which he has waived his argument.

on clearly erroneous factual findings, or (3) where no rational basis exists in the evidence to support its ruling." *United States v. A.S.*, 939 F.3d 1063, 1070 (10th Cir. 2019) (quotation marks omitted).

## A. *Rule 404(b)*

"Because Rule 404(b) only limits evidence of 'other' crimes—those extrinsic to the charged crime—evidence of acts or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b)." *United States v. Parker*, 553 F.3d 1309, 1314–15 (10th Cir. 2009). "Evidence is considered 'intrinsic' when it is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury, and 'extrinsic' when it is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015) (internal quotation marks omitted).[3]

The government's arguments in this case are addressed to the elements of the charges, although "[w]e have never required that the other-act evidence establish an element of the charged offense." *Irving*, 665 F.3d at 1212; *see also Kupfer*, 797 F.3d

---

[3] Rule 404(b) was recently amended, "principally to impose additional notice requirements on the prosecution in a criminal case." Fed. R. Evid. 404, advisory committee's note to 2020 amendments. The 2020 amendments also returned the word "other" to the position it occupied prior to the 2011 amendment "to confirm that Rule 404(b) applies to crimes, wrongs and acts 'other' than those at issue in the case," but this was not intended to substantively impact the Rule. *Id.* Because the 2020 amendments do not alter the intrinsic/extrinsic distinction at issue in this appeal, they do not bear upon our analysis.

9

at 1238 (listing situations where evidence is intrinsic). To prove Mr. Alfred's guilt on count one, the government needed to prove beyond a reasonable doubt he "knowingly attempted to persuade, induce, entice, or coerce [Nikki] to travel in interstate commerce, and . . . made this attempt with the intent for [Nikki] to engage in prostitution." *United States v. Tee*, 881 F.3d 1258, 1263–64 (10th Cir. 2018). To prove his guilt on count two, the government needed to prove beyond a reasonable doubt Mr. Alfred "used [a] facility in interstate commerce with the intent to facilitate the promotion, management, establishment, or carrying out of an unlawful activity, and . . . attempted to promote, manage, establish, or carry out an unlawful activity." *Id.* at 1266. It also needed to show "that [his] involvement in a proscribed activity [was] more than 'sporadic' or 'casual,'" but this showing could be made through a single transaction. *United States v. Bernaugh*, 969 F.2d 858, 865 (10th Cir. 1992). The government argues the memes were intrinsic to count one because they were part of Mr. Alfred's efforts to persuade Nikki to work as a prostitute, and they were intrinsic to count two because Mr. Alfred's attempt to brand himself as a pimp was part of an ongoing business enterprise.

Mr. Alfred argues the district court abused its discretion in finding the memes were intrinsic evidence by relying on clearly erroneous findings of fact—that the memes were available on Mr. Alfred's profile page and that memes from three years before the charged conduct were part of an attempt to cultivate a brand. He also claims the district court abused its discretion by making a clear error in judgment manifested as misunderstandings about social media. Mr. Alfred does not contest that

10

if the district court's findings were correct and if the evidence is probative of Mr. Alfred's branding, it is intrinsic evidence. For the reasons stated below, we reject each of Mr. Alfred's arguments.

### 1. Findings of Fact

In support of his argument that the district court made clearly erroneous findings of fact about the accessibility of the memes, Mr. Alfred cherry-picks portions of the pretrial hearing in which the district court made a mistake of terminology or otherwise indicated it was not familiar with social media. *E.g.* Reply Br. at 2 (quoting the district court as stating "these memes . . . were *posted to* what I am going to call a landing page" and the memes were "*available on* his profile page or landing page" (quoting ROA, Vol. IV at 894–95)) (emphasis in Reply Brief). Mr. Alfred argues the district court's finding that the memes were available on his profile page was critical to its conclusion that the memes were an attempt to cultivate a brand. But a comprehensive reading of the transcript shows the district court understood the salient points: that the memes were accessible by clicking either of two links on Mr. Alfred's profile page and thus they could be "easily seen" by others he was in contact with, even though they were posted three years prior to the relevant period. ROA, Vol. IV at 895–97.

Mr. Alfred argues that because he could have set his profile to be accessible only to people he friended, and the government failed to show that anybody but G-Baby could access them, there was no evidence the memes were readily available. This argument is unpersuasive. According to Mr. Alfred, it is reasonable to presume

11

"at some point in their online relationship, Mr. Alfred 'friended' G-Baby. Thus, it is entirely likely that Mr. Alfred had his privacy settings set to friends only and [A]gent Tangeman was only able to view the memes on account of "G-Baby's" 'friend' status." Appellant Br. at 15. The problem for Mr. Alfred is that if this presumption is reasonable, it is also reasonable to infer Mr. Alfred would similarly friend other women he sought to recruit. On the other hand, if Mr. Alfred did not friend G-Baby, it must be the case that his profile was set to public view. Either way, it is reasonable to infer that any women Mr. Alfred was trying to recruit were able to see the memes.

Mr. Alfred also argues "he had posted 107 photos. Of these, the government only sought to introduce eight memes that related to pimping. The fact that less than eight percent of his photos were related to pimping undermines any notion that Mr. Alfred was finely curating his online presence in an attempt to cultivate his image as a pimp." Appellant Br. at 16. But as counsel conceded at oral argument, the government entered or sought to enter far more than eight photos from Mr. Alfred's Tagged account, including not only memes but also pictures it claimed were designed to promote Mr. Alfred's brand. One picture, for example, shows Mr. Alfred ironing money next to a gun; others portrayed material goods—earrings, shoes, and guns— which the district court held were relevant to pimping culture. Because all of these images were available on Mr. Alfred's Tagged account to those he sought to recruit, the district court did not abuse its discretion in allowing the jury to consider whether Mr. Alfred was using them to cultivate a brand.

12

Finally, Mr. Alfred suggests the two excluded memes cut against his brand because they "were deplorable depictions of violence against women" and thus "undermine[] the notion that Mr. Alfred was systematically curating his online posts to build a business that would attract women to come work for him and participate in prostitution." Appellant Br. at 17. But the text on both images indicates that violence against women engaged in prostitution occurs when they do not have a pimp. As the government put it at the evidentiary hearing: "It is not a meme saying that Mr. Alfred is going to beat his women. It's saying this is what happens when you don't have me." ROA, Vol. IV at 888.

The district court's factual findings about the availability and purpose of the memes are not erroneous, let alone clearly erroneous.

### 2. Understanding of Social Media

Regarding the asserted clear error in judgment, Mr. Alfred argues the district court misunderstood social media because posts are "meant to be taken as ephemera, as fleeting thoughts," but the district court "attempted to view all Tagged usage as a 'storefront' or as a business webpage." Appellant's Br. at 18; *see also* Reply Br. at 4–8 (arguing that "the true nature of memes and social media" undermines the district court's decision and government's response, and that "[m]emes are not reflective of the poster's core beliefs, values, or ideas; but are riffs on oftentimes mundane social situations or cultural-specific wordplay"). According to Mr. Alfred, "[t]he fatal flaw in the government's argument is that it presupposes that Mr. Alfred had a brand to begin with. . . . [T]here is no evidence that Mr. Alfred was using social media in the

13

same manner" as a corporation or a professional athlete uses social media. Reply. Br. at 7–8.

This argument ignores the integral nature of social media to Mr. Alfred's attempts to solicit prostitution. Mr. Alfred cites *United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010), for its conclusion that the admission of a social media profile was "classic evidence of bad character, which was offered by the government to prove only 'action in conformity therewith.'" (quoting Fed. R. Evid. 404(b) (2010)).[4] *Phaknikone* is inapposite because the underlying crime was a bank robbery that had nothing to do with the social media posts. Here, Tagged was the means by which the criminal conduct occurred and a jury could conclude Mr. Alfred's easily accessible memes and pictures were an integral part of the solicitation attempt and advancement of his business. As the district court held, that the memes were readily available "combined with other evidence where he is reaching out to various other people in what the government characterizes . . . as an attempt to solicit people . . . make[s the memes] intrinsic." ROA, Vol. IV at 897.

The district court did not abuse its discretion in finding the evidence admissible for the purposes of showing Mr. Alfred's "brand" on Tagged. Record evidence demonstrates Mr. Alfred was using Tagged to solicit at least one Tagged

---

[4] The language quoted from Rule 404(b) was subsequently "amended as part of the restyling of the Evidence Rules," but the changes were "stylistic only." Fed. R. Evid. 404(b) advisory committee's note to 2011 amendment.

user ("Nikki") to engage in prostitution and that his profile page and photos were available to those he was trying to recruit.

## B. *Rule 403*

Under Federal Rule of Evidence 403, evidence is excluded where "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Overturning a Rule 403 decision on appeal is an uphill battle; "[n]ot only is the exclusion of evidence under Rule 403 an extraordinary remedy that should be used sparingly, but the district court has considerable discretion in performing the Rule 403 balancing test." *United States v. Merritt*, 961 F.3d 1105, 1115 (10th Cir. 2020) (internal quotation marks and citations omitted). "In engaging in the requisite balancing, courts give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Henthorn*, 864 F.3d 1241, 1256 (10th Cir. 2017) (internal quotation marks omitted).

The parties disagree about the probative value of the memes. Mr. Alfred maintains "the probative value of the evidence is extremely minimal" because (1) he reposted the memes from other users; (2) "the time frame on its own makes them too attenuated"; and (3) he was engaged in puffery both in posting the memes and in recruiting "Nikki." Appellant Br. at 19–21. In his reply brief, Mr. Alfred further argues the memes were "not advancing anything other than humor." Reply Br. at 13. The government, in turn, contends the memes provided context for Mr. Alfred's attempts to get "Nikki" to engage in prostitution and were evidence of Mr. Alfred's

15

brand, thereby demonstrating his unlawful activities were more than casual or sporadic.

The maximum probative value of the memes was significant. As discussed, a jury could conclude from the memes that Mr. Alfred was branding himself as a pimp. Mr. Alfred's arguments that the memes' probative value was lessened by his reposting them from other users and that he was engaged in puffery do not affect the *maximum* probative force of the memes. *See Henthorn*, 864 F.3d at 1256. And while the fact they were posted years earlier might slightly diminish their probative value, the memes were available in real time to a visitor to Mr. Alfred's profile page with the click of a mouse. Furthermore, many of the memes specifically reference why a sex worker benefits from having a pimp. In short, they are probative of Mr. Alfred's attempt to use his Tagged profile to facilitate a pimping business by demonstrating to his potential recruits on Tagged the benefits of having a pimp. As a result, the memes support the government's charge that his interaction with "Nikki" was not a casual or sporadic incident. They also refute Mr. Alfred's defense that his interactions with "Nikki" were in jest. The memes were therefore probative of the charges against Mr. Alfred.

We turn now to whether the probative value of the memes is substantially outweighed by the risk of unfair prejudice. Fed. R. Evid. 403. "Virtually all relevant evidence is prejudicial to one side or the other." *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013). For Rule 403 to bar evidence, the prejudice must be unfair. *Id.* "The term 'unfair prejudice,' as to a criminal defendant, speaks to the

16

capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Isabella*, 918 F.3d 816, 837 (10th Cir. 2019) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). Thus, evidence is unfairly prejudicial when "it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *Irving*, 665 F.3d at 1213–14 (quotation marks and alteration omitted).

Mr. Alfred suggests these memes were "textbook propensity" evidence, which might lead the jury to find "because Mr. Alfred posted these memes, he disrespects women and likely acted in conformity with that character trait when he attempted to solicit G-Baby to become a prostitute." Appellant Br. at 21.[5] The government suggests any prejudice was not unfair because it "flowed from the memes' legitimate probative force—providing context and background to the jury regarding [Mr.] Alfred's communications with Nikki and the other Tagged users—[and] not from" forbidden propensity inferences. Appellee Br. at 39. It also suggests any unfair prejudice was reduced because the district court excluded some memes; the government did not focus on the memes at trial; and the distasteful nature of the

---

[5] In his reply brief, and only in his reply brief, Mr. Alfred also raises the possibility that the memes triggered implicit bias. By failing to raise this argument in his opening brief, Mr. Alfred has waived it. *Walker*, 918 F.3d at 1151.

memes was due to the distasteful nature of the charges. The government has the better argument.

The danger of unfair prejudice from the memes was relatively low in the context of the charges. The government was required to prove beyond a reasonable doubt that Mr. Alfred's involvement in pimping was not casual or sporadic. *Bernaugh*, 969 F.2d at 865. It met that burden by providing evidence of the explicit discussions Mr. Alfred had with Nikki describing terminology and practices used in the sex trade and his suggestion that she turn a "trick" to get the money to travel to him. While the memes provided other evidence of Mr. Alfred's long-held interest in pimping, any prejudice arose from the fact that they tended to show Mr. Alfred was, aspired to be, or held himself out as, a pimp. This was probative of an element of the offense.

"The trial court has broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value." *Irving*, 665 F.3d at 1214 (quotation marks omitted). As the maximum probative value of the memes was high and the minimum unfair prejudice relatively low, the district court acted well within its discretion in holding that any danger of unfair prejudice did not substantially outweigh the memes' probative value.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM**.