# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2651

_____

United States of America,

Appellee,

v.

Scott Plumley,

Appellant.

\* \* \* \* \* \* \* \* \*

_____

No. 99-2997

_____

United States of America,

Appellee,

v.

Jeremy Thomas Kaune,

Appellant.

\* \* \* \* \* \* \* \* \* \* \*

Appeals from the United States
District Court for the
Northern District of Iowa.

_____

Submitted: January 11, 2000

Filed: April 3, 2000

_____

Before WOLLMAN, Chief Judge, FLOYD R. GIBSON, and MURPHY,
    Circuit Judges.
_____

WOLLMAN, Chief Judge.

In this consolidated appeal, Scott Plumley challenges the district court's[1] decision to enhance his sentence and Jeremy Kaune raises various issues related to his sentence and jury trial. We affirm.

## I.

In the spring of 1997, Plumley and Kaune frequently associated with Craig Burns, Nick Carner, Raymond Jenaman, John Schoenberger, and Nicholas Ware, a group of young white men who harbored racial animus toward blacks. During this period, the group's bias became focused on the Hills and Dales Child Development Center (Hills and Dales) in Dubuque, Iowa, a daycare facility at which Schoenberger's former girlfriend, Jennifer Mundschenk, worked. Mundschenk had recently begun dating Terry Brown, an African-American co-worker, and in late April the group began to engage in a pattern of criminal conduct intended to intimidate and harass Mundschenk and Brown. This conduct included acts of vandalism and graffiti as well as the sending of threatening notes and packages. It culminated on May 16, 1997, when some members of the group collaborated to detonate a pipe bomb on the front porch of Hills and Dales. The bombing caused substantial property damage but no injuries.

---

[1]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

Although Kaune was not involved in the pipe bombing, the day before this incident he and other members of the group had traveled across the Iowa border to East Dubuque, Illinois, for the purpose of stealing a motorcycle. This motorcycle was used in the bombing the next day. Several days later, other members of the group traveled to Galena, Illinois, and stole two more motorcycles.

In June of 1997, a federal grand jury convened in Cedar Rapids, Iowa, to inquire into these and other criminal activities of members of the group. During Plumley's grand jury testimony on June 17, he generally claimed to have no knowledge of any crimes and offered an innocent explanation for the acquisition of the motorcycles. Two days later, Carner and Jenaman initially gave testimony that was consistent with Plumley's story. Outside the grand jury room, however, they both recanted this testimony and were then taken back before the grand jury, where they admitted that they had lied and said that Plumley had urged them to do so. Plumley subsequently pleaded guilty to charges of perjury, 18 U.S.C. § 1623, obstruction of justice, 18 U.S.C. § 1503, interstate transportation of stolen motor vehicles, 18 U.S.C. § 2312, and conspiracy to transport stolen motor vehicles, 18 U.S.C. § 371. He was sentenced to 30 months' imprisonment.

Kaune, who had been identified by Carner and Jenaman as a participant in the May 15 motorcycle theft, was visited on September 9, 1997, by a Dubuque police officer and special agent Damian Bricko of the Federal Bureau of Investigation (FBI). In response to the officers' questions regarding the motorcycle theft, Kaune disclaimed any knowledge or involvement and offered an alibi that closely resembled both Plumley's account and the false story initially given by Carner and Jenaman. The next day, Kaune repeated this information before the grand jury, claiming that he had been working at the time of the theft.

On June 9, 1998, more than eight months later, Bricko contacted Kaune on behalf of the United States Attorney's office to recommend to Kaune that he obtain

counsel. During this meeting, Kaune suggested that Bricko check Kaune's work records to confirm that he could not have been involved with the motorcycle theft. The work records, to the contrary, revealed that this was a false alibi, and Kaune was indicted on charges of conspiracy to transport a stolen vehicle, 18 U.S.C. §§ 2 & 2312, perjury, 18 U.S.C. § 1623, and making a false statement to an investigator, 18 U.S.C. § 1001. Following a jury trial, Kaune was convicted on all counts and sentenced to 34 months' imprisonment.

## II.

### A. Plumley's Claims

At sentencing, the district court, finding that Plumley had threatened several of his cohorts with physical violence if they testified against him, increased Plumley's base offense level for the obstruction of justice count by three levels pursuant to section 2J1.2(b)(1) of the sentencing guidelines. We review the district court's factual findings for clear error, and its application of the guidelines de novo. See United States v. Hunt, 171 F.3d 1192, 1195 (8th Cir. 1999).

#### 1. Sufficiency of the Evidence

Schoenberger testified at the sentencing hearing that, during the police investigation of the pipe bombing, Plumley on one occasion "informed us all to keep our mouth shut," because if anyone cooperated with the police he would "kick our ass." Plumley denied saying any such thing, and the district court observed that some details of Schoenberger's rendition of the threat had changed since his initial description before the grand jury. Plumley now contends that the court's conclusion that he issued the threat is insufficiently supported by the evidence in the record.

The district court acknowledged that it was a "very, very close call whether the statement was made or not," but nonetheless found that the government had met its burden by a preponderance of the evidence.  This was the correct standard of proof, see United States v. Hoelzer, 183 F.3d 880, 882 (8th Cir. 1999) (preponderance of the evidence required at sentencing), and we have held that "'a district court's decision to credit a witness's testimony over that of another can almost never be clear error unless there is extrinsic evidence that contradicts the witness's story or the story is so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.'"  United States v. Womack, 191 F.3d 879, 885 (8th Cir. 1999) (quoting United States v. Heath, 58 F.3d 1271, 1275 (8th Cir. 1995)) (brackets omitted).  Our review of the record on this point does not leave us with a "definite and firm conviction" that a mistake has been made, see United States v. Whatley, 133 F.3d 601, 606 (8th Cir.), cert. denied, 524 U.S. 940, and cert. denied, 524 U.S. 945 (1998), and thus we conclude that the district court's finding that Plumley made the threat was not clearly erroneous.

## 2.    Seriousness of Threat

Plumley next argues that, even if he made the statement, his conduct was not serious enough to warrant an eight-level enhancement.  We reject this argument, for we agree with the district court's characterization of Plumley's threat as "very serious obstruction of justice, because it's an intent to intimidate the witness into testifying a certain way."  The text of section 2J1.2(b)(1) simply prescribes an eight-level enhancement "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."  U.S.S.G. § 2J1.2(b)(1).  This language does not impose an additional "seriousness" requirement beyond the fact of a violent threat.  Although the background commentary indicates that the guideline reflects "the more serious forms of obstruction," id., comment. (backgr'd), we agree with our sister circuits that have found that threats of violence, as such, necessarily fit within this category.  See, e.g., United States v. Sidhu,

130 F.3d 644, 652 (5th Cir. 1997) (section 2J1.2(b)(1) applies so long as there is a "threat of physical injury"); United States v. Versaglio, 85 F.3d 943, 949 (2d Cir. 1996) (section 2J1.2(b)(1) applies to "more serious conduct such as threatening a witness"); United States v. Moody, 977 F.2d 1420, 1425 (11th Cir. 1992) (threats of violence strike "at the heart of our system of justice").

### 3.      Nexus with Underlying Offense

Finally, Plumley urges that the connection between the threat and the conduct underlying the obstruction of justice charge is too tenuous for the threat properly to support a "specific offense characteristic" enhancement based on section 2J1.2(b)(1). We apply the "relevant conduct" concept when considering the nexus between the offense of conviction and an enhancement based on a specific offense characteristic. See U.S.S.G. § 1B1.1, comment. (n.1*l*) (defining "offense" to include relevant conduct); United States v. LeCompte, 108 F.3d 948, 951 (8th Cir. 1997). Relevant conduct includes "all acts or omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). Whether an act or omission constitutes relevant conduct is a factual determination subject to review under the clearly erroneous standard. See United States v. Georges, 146 F.3d 561, 562 (8th Cir. 1998).

The obstruction of justice charge against Plumley was based on a June 19, 1997, conversation in which he instructed Jenaman and Carner to give perjurious testimony consistent with the false alibi Plumley had offered before the grand jury two days earlier. According to Schoenberger's testimony at the sentencing hearing, Plumley's threat to him was issued sometime in May of 1997. This threat thus preceded both Plumley's own grand jury testimony and his attempt to enlist others to lie. Plumley emphasizes this timing issue in support of his contention that the threat and the conduct underlying the obstruction of justice charge are insufficiently related to one another; he

also claims that the threat involved only the pipe-bombing investigation whereas the instructions to Jenaman and Carner focused on the government's inquiry into the motorcycle thefts. We are not persuaded by these arguments.

First, the fact that Plumley's threat occurred prior to the conduct that formed the basis for his obstruction of justice conviction does not mean that the threat may not be considered relevant conduct for purposes of a "specific offense characteristic" enhancement. Cf., e.g., United States v. Geralds, 158 F.3d 977, 979 (8th Cir. 1998) (drug transaction occurring eighteen months before offense of conviction deemed relevant conduct for sentencing purposes); United States v. Taylor, 88 F.3d 938, 942 (11th Cir. 1996) (conduct occurring before offense of conviction may form basis for specific offense characteristic enhancement). Second, the record does not support a sharp distinction between either the motorcycle-theft and the pipe-bombing facets of the investigation or Plumley's various attempts to thwart these inquiries. Rather, both Plumley's threat and his subsequent efforts to ensure that his companions' grand jury testimony aligned with his own appear to have been part of an overall scheme to evade responsibility for the theft and the bombing alike – crimes that were, after all, related to one another from the outset. We thus conclude that the district court did not clearly err in imposing the section 2J1.2(b)(1) enhancement. See United States v. Duarte, 28 F.3d 47, 48-49 (7th Cir. 1994) (section 2J1.2(b)(1) enhancement proper although threat against witness made after defendant had already pleaded guilty; provision not intended "to introduce refined distinctions within the broad category of obstruction of justice," such that it could be applied only to threats prospectively designed to impede investigation or prosecution of offense of conviction).

**B. Kaune's Claims**

**1. Sentencing Issues**

*a. Substantial Interference Enhancement*

Kaune's base offense level for perjury was adjusted upward three levels pursuant to section 2J1.3(b)(2) of the guidelines, which provides for such enhancement when the perjury "resulted in substantial interference with the administration of justice." An upward adjustment for substantial interference is warranted where the perjury necessitated "the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.3, comment. (n. 1).

Kaune contends that the substantial interference enhancement amounts to "double-counting" a single statement that he repeated on several occasions, and that this effectively penalizes him for exercising his right to testify on his own behalf during judicial proceedings. We note that, at sentencing, there appears to have been some confusion about which statements in fact formed the basis for the enhancement. The perjury charge itself was based on Kaune's grand jury testimony, in which he flatly denied any involvement in the motorcycle theft. Kaune reasserted this denial on two subsequent occasions, each time supplying a different alibi.[2] Although the district court initially announced its intention to rely in part on one of these statements to justify the section 2J1.3(b)(2) enhancement, during the sentencing hearing the court orally

---

[2]The first such occasion was Kaune's unsolicited assertion to Bricko that he had been working at the time – a claim that formed the basis for the false statement charge. The second occasion was at trial, when Kaune claimed that he had not been working but instead was at home when the motorcycle theft occurred.

amended this decision, choosing instead to rely only on separate statements regarding legal representation that Kaune had made during two suppression hearings.

At the first of these hearings, which was held on December 1, 1998, Kaune alleged under oath that federal law enforcement agents had advised him not to consult a lawyer prior to his appearance before the grand jury – a claim central to Kaune's argument that his grand jury testimony was tainted. In response, the government called Bricko, the agent who had purportedly given Kaune this advice, to the stand. Bricko insisted he never told Kaune such a thing, and the court denied the motion to suppress Kaune's grand jury testimony.

The second suppression hearing took place on February 3, 1999. Kaune had moved to suppress his June 9, 1998, statement to Bricko on the grounds that Bricko's visit constituted an improper communication by an agent of the United States Attorney's office with a represented party in violation of Iowa's rules of professional ethics. To support the position that he was a represented party at the time, Kaune recounted a discussion concerning his grand jury testimony that he had had with Paul Kaufman, a state public defender who had represented Kaune in unrelated matters. This testimony, which materially conflicted with an account of the discussion Kaune had given at the earlier suppression hearing, forced the government to call Kaufman as a witness in order to counter Kaune's version of their discussion. The district court denied this motion to suppress as well.

These two incidents were wholly separate from, and in addition to, both Kaune's statement to the grand jury that led to the perjury charge and his statement to Bricko that led to the false statement charge; thus, no "double-counting" occurred. The district court, in order to enhance Kaune's sentence under section 2J1.3(b)(2), was required to be convinced of his untruthfulness on these occasions by a preponderance of the evidence. See Hoelzer, 183 F.3d at 882. The court found that Kaune had lied at both suppression hearings, and such credibility determinations are "close to invulnerable on

appeal." United States v. Due, No. 99-1310, 2000 WL 233239, *3 (8th Cir. March 2, 2000). Moreover, given the resultant need for additional preparation, investigation, and testimony, we find that the district court's conclusion that Kaune's perjury at the suppression hearings required the unnecessary expenditure of substantial governmental and court resources is not clearly erroneous. See United States v. Sinclair, 109 F.3d 1527, 1538-40 (10th Cir. 1997) (discussing scope of § 2J1.3(b)(2) and the meaning of "substantial governmental or court resources" in application note 1).

### b. Propriety of Consecutive Sentence

Kaune argues that the district court erred in ordering that his 34-month federal sentence run consecutive to a state court sentence that resulted from the revocation of parole just prior to Kaune's federal sentencing. We find nothing in section 5G1.3, the guideline that deals with the sentencing of a defendant already subject to an undischarged term of imprisonment, to indicate any reversible error in this decision. Although the district court incorrectly concluded that it did not have discretion to impose a concurrent sentence under section 5G1.3(c), see United States v. Moore, 160 F.3d 509, 510 (8th Cir. 1998); it made clear that it would not have done so in any event, and we find that the sentence actually imposed was consistent with the guidelines. See id.; United States v. Lange, 146 F.3d 555, 556 (8th Cir. 1998).

### 2.    Alleged Prosecutorial Improprieties

### a. References to Plea Agreements at Trial

Kaune contends that, at trial, the government improperly vouched for the credibility of prosecution witnesses Jenaman, Ware, and Plumley by soliciting testimony that they had entered into cooperation plea agreements requiring them to tell the truth. Kaune objected to this questioning and requested a cautionary instruction pointing out that prosecutors often have no way of knowing whether witnesses are

telling the truth or not. Kaune's objection was overruled, and the district court declined to give the requested instruction.

We review both the admission of testimony and the formulation of jury instructions for abuse of discretion. See United States v. Bad Wound, No. 99-1550, 2000 WL 175154, *1 (8th Cir. Feb. 16, 2000) (testimony); United States v. Einfeldt, 138 F.3d 373, 378 (8th Cir. 1998) (jury instructions). We have held that a prosecutor may inquire into the terms of a cooperating witness's plea agreement so long as this information is not used as evidence of the defendant's guilt and the jury understands its duty to judge witness credibility independently. See United States v. Willis, 997 F.2d 407, 414 (8th Cir. 1993); United States v. Drews, 877 F.2d 10, 12 (8th Cir. 1989). District courts are under no obligation to instruct juries to consider accomplice testimony with extra caution. See United States v. Rockelman, 49 F.3d 418, 423 (8th Cir. 1995); Drews, 877 F.2d at 12-13.

In this case, recitation of the terms of the plea agreements served as an aid to the jury in reaching its own credibility determinations. During closing argument the prosecutor reminded the jury that "we live in a system where the government cannot force people to testify truthfully," and that "your job is to judge their credibility." Moreover, the government said nothing to imply that Kaune must be guilty because his friends had pleaded guilty. We presume that the jurors gave the testimony "such weight as they thought it deserved, taking into account whether the witnesses' testimony may have been influenced by a desire to please the government." Drews, 877 F.2d at 12. The district court thus did not abuse its discretion in allowing testimony about the cooperation plea agreements and in refusing to issue a cautionary instruction.

### b. Closing Argument

Kaune alleges prosecutorial misconduct because, during the government's rebuttal argument, the prosecutor defended the use of cooperation plea agreements by stating:

> "My job is to enforce the law. And the way I have to do that, to get at the truth, is to give some benefit or hope of benefit to some of these people, then that's what I've got to do or else we're going to let crime go unpunished."

At another point, the prosecutor told the jury, "Here's what happened in my view. The defendant lied to his mother. He lied to his girlfriend. He lied to his probation officer." Kaune argues on appeal that these statements by the prosecutor amounted to further instances of improper vouching.

In order to prove prosecutorial misconduct, a defendant must show that (1) the prosecutor's remarks were improper, and (2) the remarks prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. See United States v. Macklin, 104 F.3d 1046, 1049 (8th Cir. 1997). If we reach the second step, we consider (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) any curative actions taken by the trial court. See United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996).

During Kaune's own closing statement, his attorney unfavorably compared the credibility of prosecution witnesses Jenaman, Ware, and Plumley to that of certain defense witnesses. He also likened cooperation plea agreements to "a lawyer who handed a witness some money in order to influence their testimony," suggesting to the jury that such behavior generally "would be frowned upon." We conclude that the government's subsequent justification of cooperation plea agreements, which did not

include any suggestion that the prosecutor had independently verified witnesses' testimony, constituted a "fair response and rebuttal" prompted by these statements of defense counsel. United States v. Lee, 743 F.2d 1240, 1253 (8th Cir. 1984). As such, it does not warrant reversal. See id.

The prosecutor's remark "Here's what happened in my view" is more plausibly read as the equivalent of his saying "Here is what the evidence established" than as constituting an unvarnished expression of his personal belief in Kaune's guilt. Although the latter is not permitted, see United States v. Young, 470 U.S. 1, 8-9 (1985), to prohibit the former would be to unduly circumscribe the prosecutor's right and duty to "prosecute with earnestness and vigor." Berger v. United States, 295 U.S. 78, 88 (1935). In any event, in light of the numerous witnesses who testified that Kaune participated in the May 15, 1997, bike theft, the district court's clear instruction that credibility determinations were for the jury alone, and the prosecutor's own statements to the same effect, we conclude that this comment, if in fact it crossed over into the gray zone between clearly acceptable and clearly unacceptable advocacy, see Young, 470 U.S. at 7, was at most harmless error. See United States v. Triplett, 195 F.3d 990, 997 (8th Cir. 1999); United States v. French, 88 F.3d 686, 688-89 (8th Cir. 1996).

### c. Ex Parte Contact

Kaune, who testified before the grand jury on September 10, 1997, that he had a lawyer, argues that Bricko's June 9, 1998, visit on behalf of the United States Attorney's office constituted improper *ex parte* communication. Kaune contends that this contact violated Iowa Rule of Professional Responsibility DR 7-104(A)(1), which provides:

(A) During the course of representing a client a lawyer shall not:

(1)  Communicate or cause another to communicate on the subject of the representation with a party known to be represented by a lawyer in that matter except with the prior consent of the lawyer representing such other party or as authorized by law.

Kaune suggests that we read this provision in conjunction with a formal opinion of the Iowa Supreme Court Board of Professional Ethics and Conduct that interprets Rule DR 7-104(A)(1) to prohibit state prosecutors from talking with a represented criminal defendant on any subject without the consent of the defendant's lawyer.  In support of this approach, Kaune directs our attention to the recently-enacted Ethical Standards for Prosecutors Act, 28 U.S.C. § 530B (1999), which provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, *to the same extent and in the same manner as other attorneys in that State*."  Id. (emphasis added); cf. United States v. Lowery, 166 F.3d 1119, 1124-25 (11th Cir.), cert. denied, 120 S. Ct. 212 (1999) (interpreting Act in context of federal criminal proceeding).  Although this statute may inform our approach to future cases such as this, we need not consider it here because it did not become effective until April 21, 1999, well after the June 9, 1998, contact between Kaune and Bricko.  In the meantime, we agree with those courts that have concluded that the interpretation of state disciplinary rules as they apply to federal criminal law practice "should be and is a matter of federal law."  Grievance Comm. for the Southern Dist. of N.Y. v. Simels, 48 F.3d 640, 646 (2d Cir. 1995); see id. at 645-46 (collecting cases); Cord v. Smith, 338 F.2d 516, 524 (9th Cir. 1964) ("When an attorney appears before a federal court, he is acting as an officer of that court, and it is that court which must judge his conduct.").

As a matter of federal law, we find that Kaune's argument that the district court should have suppressed his statement to Bricko is foreclosed by our precedent.  We have previously held that Minnesota's ethical rule DR 7-104(A)(1), which is

substantively identical to Iowa's rule, "does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel." United States v. Dobbs, 711 F.2d 84, 86 (8th Cir. 1983); see also United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir. 1983) (holding that Minnesota's rule DR 7-104(A)(1) did not prevent a federal prosecutor from wiring a represented defendant's accomplice for the purpose of surreptitiously eliciting a confession); cf. United States v. Ingle, 157 F.3d 1147, 1151 (8th Cir. 1998) (citing Fitterer and Dobbs); United States v. Balter, 91 F.3d 427, 436 (3d Cir. 1996) (same). Accordingly, we find that the district court correctly denied Kaune's motion to suppress.

### 3.   Perjury Conviction

Kaune challenges his perjury conviction on the basis of immateriality. A witness testifying under oath commits perjury if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993); see United States v. Berndt, 86 F.3d 803, 810 (8th Cir. 1996); 18 U.S.C. §§ 1621, 1623.

During his grand jury testimony, Kaune was asked whether he had "ever traveled to East Dubuque or Galena or anywhere in between, Illinois, with Ware, Plumley, Burns, Jenaman or Schoenberger." He answered, "No, I haven't." Kaune contends that this broad question, which formed the basis for his conviction, was so generalized that his response to it had no tendency to "'influence, mislead, or hamper'" the investigation. United States v. Moeckly, 769 F.2d 453, 465 (8th Cir. 1985) (quoting United States v. Lasater, 535 F.2d 1041, 1047 (8th Cir. 1976)). We reject this argument.

Although it is true that this particular question did not address the "ultimate issue" of whether Kaune was with the named individuals at the time the motorcycle was stolen, it was not thereby rendered immaterial. See United States v. Feldhacker, 849 F.2d 293, 298 (8th Cir. 1988) (statement material when truthful answer would have raised questions about role of others in offense); Moeckley, 769 F.2d at 465 (statement material when witness obscures whereabouts or involvement in offense); United States v. Ashby, 748 F.2d 467, 471 (8th Cir. 1984) (statements about seemingly peripheral matters can become material when considered in context). Indeed, the government initially charged Kaune with two counts of perjury, the other count having been based on his denial of the more specific, "ultimate" question. Kaune objected to these dual charges on the grounds that they were multiplicitous, and he cannot now be heard contradictorily to complain that the count the government chose to pursue insufficiently resembled the count it dropped at Kaune's behest.

## 4.    Other Arguments

We have carefully considered the remainder of Kaune's claims, and find them to be without merit.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.