**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

G'ANTE BUTLER,

    Defendant - Appellant.

No. 24-3061

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:21-CR-20027-JAR-1)**
_____

Paige Nichols, Assistant Federal Public Defender (and Melody Brannon, Federal Public Defender, with her on the briefs), Topeka, Kansas, for Defendant-Appellant.

Bryan C. Clark, Assistant United States Attorney, (Duston J. Slinkard, Acting United States Attorney, and James A. Brown, Assistant United States Attorney, Chief, Appellate Division, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

_____

Before **HARTZ**, **KELLY**, and **CARSON**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

    Following a nine-day jury trial, Defendant-Appellant, G'Ante Butler

("G'Ante"), was convicted of forcible assault of a federal officer, 18 U.S.C. § 111(b),

and use of a firearm in furtherance of a crime of violence, 18 U.S.C.

§ 924(c)(1)(A)(iii).  I R. 656–57.  On appeal, G'Ante challenges (1) the district court's failure to give a limiting instruction that certain impeachment evidence could not be used as substantive evidence of guilt, (2) the admission of a neighbor's testimony, and (3) the prosecutor's statements during closing.  Aplt. Br. at 2.  He also asserts cumulative error and asks that we vacate his § 924(c) conviction on the ground that § 111(b) is not a crime of violence.  Id.  Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

## Background

We recount the facts in some detail given our resolution of the first claim as harmless error.  At approximately 6:30 p.m. on August 3, 2020, the Kansas City Kansas Police Department ("KCKPD") responded to a drive-by shooting at a house on Farrow Avenue in Kansas City, Kansas.  II R. 9.  The house belonged to G'Ante's parents.  Id.  G'Ante and his brother, Zarion Butler ("Zarion"), also lived there.  Id.  The Butler brothers were associated with the "Tasha Gang."  Id.  Tamani Boykin, another Tasha Gang affiliate, was injured during the shooting.  Id.  The suspected shooter was Isaiah Shields, a member of Tasha Gang's rival, "BBUx2 Gang."  Id.  Zarion drove Mr. Boykin to the hospital in Mr. Boykin's gold Ford Taurus.  Id.  Officers went to Mr. Shields's residence on North Allis Street in Kansas City, Kansas, where they took Mr. Shields into custody and executed a search warrant.  Id. at 10.

At approximately 11:20 p.m., KCKPD officers and ATF agents were leaving the North Allis Street home when they were fired upon by multiple shooters from an

2

alley west of the home.  Id.  One ATF agent was shot in the hand and a civilian-witness, J.B., sustained gunshot wounds in both hands.  Id.  The gunfire also damaged law enforcement vehicles and neighboring homes.  Id.  Over 100 shell casings were found in the alley west of the home.  Id.  Surveillance footage showed at least four shooters and showed the gold Ford Taurus and another vehicle at the scene.  Id. at 10–11.

A week after the shooting, G'Ante and co-defendant Chase Lewis were found in Kansas City, Missouri.  Id. at 11.  G'Ante was taken into custody on an active parole warrant and Mr. Lewis was detained.  Id.  Officers found a .40-caliber Glock 22 in G'Ante's pants.  Id.  In a post-Miranda interview, G'Ante denied involvement in the shooting.  Id. at 11–12.  Mr. Lewis denied the same.  Id. at 12.  Officers seized G'Ante's and Mr. Lewis's cell phones and, pursuant to a search warrant, found evidence placing G'Ante and Mr. Lewis together on the night of the shooting along with Zarion, Nadarius Barnes, and Donnell Hall.  Id. at 12–13.  Officers suspected that these five individuals carried out the North Allis Street shooting to retaliate against BBUx2 Gang for the prior shooting involving the Butler family home.  Id. at 13–14.

On June 7, 2021, Zarion was arrested in connection with the shooting.  Id. at 14.  In a post-Miranda interview, he indicated that on the night in question, he believed that members of the BBUx2 Gang were at Mr. Shields's house celebrating the shooting on the Butler family's house.  Id.  Angered by the thought of this, G'Ante, Zarion, Mr. Lewis, Mr. Barnes, and Mr. Hall hatched a plan to retaliate by

3

firing on Mr. Shields's North Allis Street home.  Id.  All five individuals were charged with forcible assault of a federal officer, §§ 111(b) and 2, and use of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii).  I R. 19–20.  Excepting G'Ante, all defendants pled guilty.  Aplt. Br. at 4.  G'Ante proceeded to trial.  Id.

Mr. Lewis testified for the government pursuant to the terms of his plea agreement, providing the following version of events.  III R. 742.  Mr. Lewis and G'Ante were associated with the Tasha Gang.  Id. at 757–58.  On August 3, 2020, G'Ante and Mr. Lewis were at a North Kansas City apartment belonging to G'Ante's girlfriend, Michaela Porter.  Id. at 760–62.  The two left that apartment and were en route to Mr. Lewis's father's house when G'Ante received a phone call notifying him of the shooting at his parent's house.  Id. at 761–62.  After receiving the call, they went to the Butler residence and returned to Ms. Porter's apartment shortly thereafter.  Id. at 762–63.  Zarion arrived at Ms. Porter's apartment in Mr. Boykin's gold Ford Taurus.  Id. at 765.  Mr. Hall then called Zarion and told him that Mr. Shields was outside of the Farrow Avenue house.  Id. at 766.  Zarion went to his parents' house while Mr. Lewis and G'Ante drove to Mr. Barnes's house.  Id. at 767.  The group convened at Mr. Barnes's house, where they got into the gold Ford Taurus, which was now driven by Mr. Lewis.  Id. at 768–71.  They met up with Mr. Hall, who drove separately, and they all drove in tandem to Mr. Shields's home.  Id. at 771–75.  As they drove toward the home, the group turned off their cell phones to avoid location

4

detection. Id. at 777. The plan was to retaliate for the earlier shooting. Id. at 789–90.

Upon arrival, G'Ante, Zarion, Mr. Hall, and Mr. Barnes exited the cars and began shooting. Id. at 775–78. Mr. Lewis remained in the car. Id. at 785. Mr. Barnes used Mr. Lewis's Glock 23, Zarion used a 9-millimeter Glock 17 and an AR pistol, G'Ante used a .40-caliber Glock 22, and Mr. Hall used a Draco firearm. Id. at 771–72, 785. Mr. Lewis then drove G'Ante, Zarion, and Mr. Barnes back to Mr. Barnes's house while Mr. Hall fled separately. Id. at 778–79. Mr. Lewis and G'Ante then returned to Ms. Porter's apartment. Id. at 782. Mr. Lewis also testified that the first statement he gave to law enforcement on August 10, 2021, wherein he denied involvement, was false. Id. at 809–10. On cross-examination, Mr. Lewis agreed that "the whole point" of testifying "is to get as much of a benefit from [his] cooperation agreement as possible[.]" Id. at 834.

The government also offered circumstantial evidence to prove that G'Ante participated in the shooting. Law enforcement officers testified about the "warring fight[s]" between BBUx2 Gang and Tasha Gang. Id. at 343, 583–85. There was also evidence of G'Ante's involvement with the Tasha Gang, including text messages where G'Ante claimed to have gang rank, his Facebook profile with the name "Tasha Gino," and pictures of him displaying gang signs. III Supp. R. 64, 14–19. SnapChat videos from the day of the shooting also showed G'Ante and Mr. Lewis together at Ms. Porter's apartment with G'Ante's Glock 22 and Mr. Lewis's Glock 23. See VI Supp. R. Ex. 5, 6, 7. Further, cell phone evidence showed that the co-defendants

5

communicated with each other hours before the shooting and showed Zarion leaving Ms. Porter's apartment around 10:45 p.m. traveling toward Mr. Shields's home. V Supp. R. 26. It then showed him traveling away from the scene around 11:30 p.m. Id. at 27. There was also evidence of three phone calls placed from Mr. Lewis's cell phone to G'Ante's mother's cell phone minutes after the shooting. III Supp. R. 24–26. Because G'Ante's phone only worked when connected to WiFi, the government suggested that these calls were placed by G'Ante while he was with Mr. Lewis after the shooting. Aplee. Br. at 24. Surveillance video showed at least four shooters. See Aplt. Br. at 15; III R. 924–27.

Dottie Newsome, an elderly woman and longtime resident of North Allis Street, testified for the government. III R. 621. She stated that shootings in the area had been going on for years. Id. at 623. But the shooting on the night in question "just kept going, kept going." Id. She was heading to her basement to take cover when she felt a bullet graze past her. Id. She later found a bullet near a chair where she would typically be watching television. Id. at 623–24. After the shooting, she "straightened out a little bit" and called her brother to pick her up. Id. at 624.

A ballistics expert testified that 19 shell casings from G'Ante's .40-caliber Glock 22 were found at the scene, along with casings from the other firearms identified by Mr. Lewis in his testimony. Id. at 949, 951–52, 955–56, 971–72. One DNA expert identified G'Ante as a possible contributor of DNA found on a .40-caliber shell casing, id. at 1095, and another testified that G'Ante was a contributor to the major DNA profile found on his .40-caliber Glock 22, id. at 1189–90. At the

6

same time, there was some support to render G'Ante's contribution to those profiles inconclusive, but Zarion was excluded as a possible contributor. II Supp. R. 18, 21.

Finally, evidence from G'Ante's phone showed he was unresponsive to text messages leading up to and during the shooting. See III R. 1464. His phone activity resumed about an hour after the shooting. Id. at 10. The day after the shooting, G'Ante sent news articles about the shooting to an associate. III Supp. R. 13–14.

The Butler brothers testified for the defense. III R. 1338, 1428. They both maintained that G'Ante was not involved in the shooting.[1] Zarion testified that G'Ante tried to persuade him from retaliating. Id. at 1347–51. Zarion also testified that he went to his parents' house to retrieve two firearms from the basement — the .40-caliber Glock 22 and a 9-millimeter Glock 17 — before meeting the group at Mr. Barnes's house. Id. at 1351–54, 1390. Zarion stated that he went back to his parents' house after the shooting to return the firearms to the basement. Id. at 1402. According to Zarion, G'Ante remained at Ms. Porter's apartment the entire time. Id. at 1386–88. Zarion testified that his post-Miranda statements implicating G'Ante were false, and that he lied to appease law enforcement and because he was angry at G'Ante for not caring about their family. Id. at 1365–66. On cross-examination, Zarion agreed that he would "do anything to protect [his] brother." Id. at 1412.

---

[1] Recall that in his June 2021 interview, Zarion implicated G'Ante in the shooting. II R. 14. Six months before G'Ante's trial, however, Zarion wrote a letter to G'Ante's attorney stating that those statements were false. III Supp. R. 65–66. Zarion now claimed that he used G'Ante's firearm during the shooting, and that G'Ante was never at the scene. Id.

7

G'Ante testified that, after learning that someone shot at his parents' house, he drove there with Mr. Lewis to give his cousin, Don, the .40-caliber Glock 22 for protection. Id. at 1430–31. He stated that he immediately returned to Ms. Porter's apartment after giving the firearm to Don. Id. at 1431–32. His testimony tracked that of Zarion, as he maintained that he was at Ms. Porter's apartment the whole time. Id. at 1433–35. G'Ante stated that he went to his parents' house the morning after the shooting to retrieve his .40-caliber Glock 22 from the basement where Zarion left it. Id. at 1436, 1468. After the Butler brothers testified, the government offered as rebuttal evidence a recording of Zarion's post-Miranda interview with law enforcement wherein he stated that G'Ante participated in the shooting. Id. at 1551–57. The recording was over an hour long. Id.

During closing, the prosecutor stated that the government presented "exactly what they believed happened" and that "much of that evidence just can't be disputed" such that the defense had to "fit around all of that evidence[.]" Id. at 1614. She stated that the defense's version of events "requires a lot of mental gymnastics." Id. at 1615. She also stated that the jury would "have to decide whether [it] believe[s] that version of events or whether [it] believe[s] Chase Lewis' version of events and all of the evidence that the government has presented[.]" Id. at 1615–16. The prosecutor suggested that Mr. Lewis would not "roll the dice by lying on G'Ante Butler[.]" Id. at 1618. Finally, she stated that defense counsel's "job is to sow doubt where there might not be any. . . . [T]hey're trying to sow confusion . . . because their job is to sow doubt." Id. at 1621.

8

The jury convicted G'Ante on both counts. I R. 656–57. He was sentenced to 190 months' imprisonment followed by 5 years' supervised release. Id. at 697–98.

**Discussion**

On appeal, G'Ante challenges: (1) the district court's failure to instruct the jury on the purposes for which Zarion's prior unsworn statements could be used, (2) the admission of Ms. Newsome's testimony, and (3) the prosecutor's statements during closing. Aplt. Br. at 2, 24. He also asks that we vacate his § 924(c) conviction because assault on a federal officer is not a crime of violence. Id. We reject these arguments and therefore affirm.

**I.     The District Court's Failure to Give a Limiting Instruction Was Harmless.**

G'Ante argues that the district court erred by declining to instruct the jury that Zarion's prior unsworn inconsistent statement could only be used for impeachment, and not as substantive evidence of G'Ante's guilt. Id. at 26. G'Ante requested an instruction which tracked this circuit's pattern instruction on impeachment by prior inconsistencies. III R. 1524–25; 10th Cir. Pattern Crim. Jury Inst. No. 1.10. The district court declined to give the instruction. III R. 1525.

Our review is for an abuse of discretion. United States v. Jereb, 882 F.3d 1325, 1335 (10th Cir. 2018). District courts must instruct the jury that a witness's prior unsworn inconsistent statement can only be used to judge the witness's credibility, and not as substantive evidence of the defendant's guilt. United States v. Carter, 973 F.2d 1509, 1512–14 (10th Cir. 1992); see also 10th Cir. Pattern Crim. Jury Inst. No. 1.10 Use Note. The district court here admitted Zarion's prior unsworn

9

inconsistent statement but declined to give a limiting instruction.  III R. 1525.  In doing so, the district court abused its discretion.  The government concedes as much, arguing instead that the error was harmless.  Aplee. Br. at 21–22.

"Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).  The government bears the burden of proving harmless error.  United States v. Freeman, 70 F.4th 1265, 1281 (10th Cir. 2023).  Where, as here, the error is not constitutional in nature, "the government bears a less onerous, but still stringent, burden."  United States v. McGirt, 71 F.4th 755, 760 (10th Cir. 2023).  The government must show that the defendant's "'substantial rights were not affected.'"  Id. (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).  If we have "'grave doubt'" about whether the error had "'substantial influence,'" then "'the conviction cannot stand.'"  Id. (quoting Kotteakos, 328 U.S. at 765).  "By 'grave doubt,' we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."  United States v. Chavez, 976 F.3d 1178, 1204 (10th Cir. 2020) (quotations omitted).  In determining whether an error is harmless, we view the error "in the context of the entire record."  Id. (quotations omitted).

Here, reviewing the trial evidence in its entirety, we are not left with "'grave doubt'" as to whether the absence of the limiting instruction had a "'substantial influence,'" on the verdict.  McGirt, 71 F.4th at 760 (quoting Kotteakos, 328 U.S. at 765).  Over the course of G'Ante's nine-day trial, the government offered unequivocal eyewitness testimony from Mr. Lewis which was corroborated by

10

substantial circumstantial evidence (law enforcement testimony, cell phone evidence, video evidence, DNA evidence, and ballistics evidence) of G'Ante's participation in the shooting.  This considerable evidence provided abundant support for the jury's verdict.  Cf. id. at 768–73 (concluding that the district court's failure to allow the jury to consider witness' prior sworn testimony as substantive evidence under Fed. R. Evid. 801(d)(1)(A) was not harmless where government's case was weak and rested solely on inconsistent and unconvincing witness testimony).  That the jury could have interpreted the government's circumstantial evidence consistently with G'Ante's alibi does not, by itself, cause us to question whether the error substantially influenced the verdict.  See Aplt. Reply Br. at 1–5.

G'Ante contends that Mr. Lewis's credibility was questionable given his plea agreement, and that the jury must have used Zarion's prior statement to corroborate Mr. Lewis's testimony and discredit the Butler brothers' testimony.  Aplt. Br. at 43. In so arguing, G'Ante seems to assume that the only corroboration of Mr. Lewis's testimony was Zarion's prior statement.  But there was substantial circumstantial evidence supporting Mr. Lewis's testimony.  And the government vigorously cross-examined the Butler brothers, exposing the weaknesses in their testimony and challenging their credibility.  III R. 1323–1412, 1418–22, 1449–73, 1476–78. Therefore, this is not a case where the only evidence supporting the government's theory was Zarion's prior statement.  Cf. McGirt, 71 F.4th at 769; see also United States v. James, 505 F.2d 898, 901 (5th Cir. 1975) (noting that district court's failure

11

to give a similar instruction was not reversible error where the government had already presented a "damning case").

The government also impeached Zarion's testimony for bias before playing the recording.  III R. 1412.  On direct examination, Zarion admitted that he implicated G'Ante in his prior statements to law enforcement, but then stated that he lied in making those statements because he was angry with his brother.  Id. at 1363–66.  On cross-examination, however, Zarion agreed that he would "do anything to protect [his] brother[.]"  Id. at 1412.  Thus, the jury had reason to reject Zarion's testimony even absent the recording.

The district court's failure to give a limiting instruction regarding the proper use of Zarion's prior unsworn statements was harmless error.  The jury heard unequivocal testimony, which was corroborated by substantial circumstantial evidence, and convicted G'Ante on both counts.  I R. 656–57.  Considering the extensive evidence produced during this nine-day trial, we are not left in "'grave doubt'" about whether the error had "'substantial influence,'" on the verdict.  McGirt, 71 F.4th at 760 (quoting Kotteakos, 328 U.S. at 765).

**II.    The District Court Did Not Err by Admitting Ms. Newsome's Testimony.**

Next, G'Ante argues that the district court erred in admitting the testimony of the government's witness, Ms. Newsome, under Federal Rule of Evidence 403.  Aplt. Br. at 29.  G'Ante made a Rule 403 objection below, which the district court overruled.  III R. 616–20.  Rule 403 allows courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or

12

needlessly presenting cumulative evidence." Fed. R. Evid. 403. District courts have "considerable discretion" under Rule 403, but exclusion of evidence under that rule "is an extraordinary remedy that should be used sparingly." United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001) (quotations omitted). "Whether to exclude evidence under Rule 403 is within the sound discretion of the trial court, and will be reversed only upon a showing of a clear abuse of that discretion." United States v. Perrault, 995 F.3d 748, 764 (10th Cir. 2021) (quotations omitted). An abuse of discretion occurs if the district court's judgment is "arbitrary, capricious, whimsical, or manifestly unreasonable." Id. (quotations omitted).

G'Ante contends that the probative value of Ms. Newsome's testimony, if any, was weak because she did not provide an eyewitness account of G'Ante's presence at the shooting. Aplt. Br. at 31. But "[a]n item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered." United States v. Porter, 881 F.2d 878, 887 (10th Cir. 1989) (quotations omitted). That Ms. Newsome's testimony does not provide an eyewitness account does not mean that it lacks probative value. Rather, her testimony related to other pertinent issues such as the unusually long duration of the shooting, thereby suggesting a retaliatory motive. Aplee. Br. at 36–37. Indeed, G'Ante seems to acknowledge that the testimony has at least some probative value as to the "jury's understanding of the crime scene[.]" Aplt. Br. at 32.

Nor are we persuaded that the probative value of the testimony is substantially outweighed by the risk of needlessly presenting cumulative evidence or unfair

13

prejudice.  Fed. R. Evid. 403; Aplt. Br. at 32.  To begin, district courts have wide discretion "[o]n whether to exclude evidence as cumulative . . . because cumulative evidence is excluded in the interests of trial efficiency, time management, and jury comprehension."  United States v. Otuonye, 995 F.3d 1191, 1208 (10th Cir. 2021) (quotations omitted).  True, law enforcement officers and a civilian witness also testified about the circumstances of the shooting.  But defense counsel impeached the law enforcement officers' testimony.  III R. 295–96, 321–22, 371–73.  Ms. Newsome's testimony, on the other hand, provided a clear record of the shooting, and she was arguably the only witness without an interest in the outcome of the trial.  Moreover, "the mere fact that two pieces of evidence might go to the same point [does not] necessarily mean that only one of them might come in."  Old Chief v. United States, 519 U.S. 172, 183 (1997).  Indeed, "the prosecution is entitled to prove its case by evidence of its own choice," even if there was other evidence available on the same point.  Id. at 186–87.

Further, "unfair prejudice must do more than simply harm a defendant's case" because "[v]irtually all relevant evidence is prejudicial to one side or the other." United States v. Archuleta, 737 F.3d 1287, 1293 (10th Cir. 2013).  "Evidence becomes unfairly prejudicial [] when it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged."  Id. (quotations omitted).  Still, when conducting Rule 403 balancing, courts must "give the evidence its maximum reasonable

14

probative force and its minimum reasonable prejudicial value." United States v. Merritt, 961 F.3d 1105, 1115 (10th Cir. 2020) (quotations omitted).

Perhaps, as G'Ante argues, Ms. Newsome was a sympathetic witness. Aplt. Reply Br. at 15–16. But her brief testimony occurred a week before the close of evidence and spanned just seven pages of a nearly two-thousand-page trial transcript. III R. 621–27. Viewed in the context of a lengthy trial where the government offered substantial evidence of guilt, we are not concerned that Ms. Newsome's testimony made "a conviction more likely" based on an "emotional response in the jury." Archuleta, 737 F.3d at 1293 (quotations omitted). Any risk of unfair prejudice accompanying Ms. Newsome's testimony does not substantially outweigh the probative value of the testimony.

### III.    The Prosecutor's Closing Statements Were Not Plainly Erroneous.

G'Ante next claims that the prosecutor made improper comments during closing which (1) distorted the government's burden of proof, (2) vouched for the government's case, and (3) impugned defense counsel and the defense function. Aplt. Br. at 37–40. G'Ante did not object at trial. Id. at 36. Our review is therefore for plain error, and G'Ante must show "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public regulation of judicial proceedings." United States v. Vann, 776 F.3d 746, 759 (10th Cir. 2015) (quotations omitted).

"The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." United States v. Young, 470 U.S. 1, 7 (1985). Still,

15

courts should not "lightly infer" that a prosecutor's ambiguous remark is intended to "have its most damaging meaning." United States v. Christy, 916 F.3d 814, 825 (10th Cir. 2019) (quotations omitted). And we must evaluate the allegedly improper remarks "in the context of the entire trial." Vann, 766 F.3d at 760 (quotations omitted).

G'Ante first argues that the prosecutor diluted the government's burden of proof by telling the jury that it would "have to decide whether you believe [the defendant's] version of events or whether you believe Chase Lewis' version of events and all of the evidence that the government has presented to you." Aplt. Br. at 37; III R. 1615–16. Misstating the law is improper advocacy. United States v. Starks, 34 F.4th 1142, 1158 (10th Cir. 2022). And we have taken issue with attempts to define "reasonable doubt." Monk v. Zelez, 901 F.2d 885, 893–94 (10th Cir. 1990). On the other hand, "prosecutorial statements implying guilt or challenging credibility" are not always improper. Christy, 916 F.3d at 830 (quotations omitted).

The prosecutor here did not try to define reasonable doubt. The comment was made in the context of discussing witness credibility, right before the prosecutor told the jury "[y]ou'll be given an instruction on witness credibility" and then assessed Mr. Lewis's testimony against that of the Butler brothers. III R. 1616–22. Thus, the comment is best interpreted as "challenging credibility." See Christy, 916 F.3d at 830 (quotations omitted). The comment was not "contrary to well-settled law," and thus was not plainly improper. Starks, 34 F.4th at 1157 (quotations omitted); see also United States v. Adams, No. 23-6121, 2025 WL 1501045, at *2–3 (10th Cir. May 27,

16

2025) (finding no plain error where prosecutor suggested the jury was to "decide which version of events was more reasonable").[2]

G'Ante next argues that the prosecutor vouched for the government's case by telling the jury that the evidence demonstrated "exactly what [the government] believed happened," including testimony "from multiple witnesses including Chase Lewis," and that "[s]o much of that evidence just can't be disputed," and suggested that Mr. Lewis had no reason to "roll the dice" and lie. Aplt. Br. at 39–40; III R. 1614, 1618. In the context of vouching, "we distinguish between a prosecutor's fair comment on the evidence to a jury, which is permissible, and vouching[.]" Starks, 34 F.4th at 1173 (quotations and citations omitted). Argument becomes vouching only if "the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurance of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony." Id. (quotations omitted).

First, the comments that the evidence showed "exactly what [the government] believed happened" and that "[s]o much of that evidence just can't be disputed" were not plainly improper. III R. 1614. In making these comments, the prosecutor did not imply a personal belief or assurance in the veracity of a witness. See Starks, 34 F.4th at 1173. Rather, the comments are best interpreted as making a "fair comment on the

---

[2] Although not precedential, we find the reasoning of this and any other unpublished decisions cited in this opinion to be instructive. See 10th Cir. R. 32.1(A).

17

evidence to [the] jury[.]" Id. Taken in context, the comments were made during the prosecutor's summary of the evidence that the government produced at trial. III R. 1614. This circuit and other circuits have found similar comments permissible. See United States v. Rogers, 556 F.3d 1130,1144 (10th Cir. 2009) (finding prosecutor's comment that "Defendant cannot explain away the evidence presented against him" permissible); United States v. Plumley, 207 F.3d 1086, 1094 (8th Cir. 2000) (noting that prosecutor's remark, "here's what happened in my view," should be interpreted as a fair comment on the evidence). This was not improper vouching.

Nor did the prosecutor's suggestion that Mr. Lewis would not "roll the dice" and lie about G'Ante's involvement in the shooting constitute improper vouching. III R. 1618. Before the prosecutor made this comment, the defense argued that Mr. Lewis's credibility was questionable given his plea agreement. Id. at 1606–07. The prosecutor thus responded to this argument, suggesting that Mr. Lewis's cooperation agreement did not provide an incentive to lie. Id. at 1616–18. A prosecutor is entitled to leeway in responding to defense counsel's closing. Christy, 916 F.3d at 825. Moreover, pointing out "a witness' obligation to testify truthfully pursuant to an agreement with the government and arguing that this gives the witness a strong motivation to tell the truth is not, by itself, improper vouching." United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990).

G'Ante also asserts that the prosecutor impugned defense counsel and the defense function by stating that the defense had to concoct its version of events to fit the evidence and that "the defense's job is to sow doubt where there might not be any

18

. . . they're trying to sow confusion . . . their job is to sow doubt." Aplt. Br. at 40–41; III R. 1614–21. True, prosecutors must "refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." Christy, 916 F.3d at 838 (quotations omitted). For example, a prosecutor cannot suggest that defense counsel was deceitful or had suborned perjured testimony. United States v. Russell, 109 F.3d 1503, 1514 (10th Cir. 1997). On the other hand, though terming it distasteful, we have declined to find plain error given a claim that defense counsel changed a story because their job "is not to find the truth," but rather to "get their clients off." Id.; see also United States v. Linn, 31 F.3d 987, 993 (10th Cir. 1994) (finding no plain error for prosecutor's "distasteful" comment that "a defense attorney's job is to mislead the jury in order to garner an acquittal"). The comments here are more akin to the latter, and are distinguishable from "unfounded and inflammatory attacks on the opposing advocate" which are objectionable. Young, 470 U.S. at 8–9. The prosecutor did not improperly impugn defense counsel or the defense function.

In any event, none of the comments affected G'Ante's substantial rights. The jury was properly instructed on the government's burden of proof several times. I R. 613–23. It was also instructed that statements of counsel are not evidence, and that it must apply the law as stated by the judge. Id. at 645, 607. This court has recognized that, even when remarks are improper, "curative instructions will typically immunize such a statement from affecting defendant's substantial rights." Vann, 776 F.3d at 760. Where, as here, "the jury was properly instructed that statements and arguments

19

of counsel are not evidence and that a defendant could only be convicted on the basis of evidence submitted at trial, [] we have consistently refused to find plain error based on misstatements by the prosecutor." Id. (quotations omitted); I R. 607, 645.

## IV.     Cumulative Error Review Does Not Apply.

G'Ante argues his claimed errors require reversal under cumulative error. Aplt. Br. at 41.  Cumulative error requires more than one error.  Frederick v. Swift Transp. Co., 616 F.3d 1074, 1084 (10th Cir. 2010).  Here, the district court committed only one error by failing to give a limiting instruction with respect to Mr. Zarion Butler's prior statement.  Thus, cumulative error does not apply.

## V.     Forcible Assault on a Federal Officer Is a Crime of Violence.

Finally, G'Ante asks that we vacate his § 924(c) conviction for use of a firearm in furtherance of a crime of violence.  Aplt. Br. at 53.  Under Federal Rule of Appellate Procedure 28(i), G'Ante adopts by reference the arguments made by his co-defendant, Mr. Barnes, in a companion appeal.  Aplt. Br. at 54. The government argues that G'Ante cannot adopt those arguments because Rule 28(i) only applies to single cases with multiple appellants or consolidated cases, but not "companion" cases.  Aplee. Br. at 57.  But we have recognized that the rule also allows panels of this court to exercise their discretion to allow adoption in companion cases like these.  E.g., United States v. Wacker, 72 F.3d 1453, 1463 n.6 (10th Cir. 1995); United States v. Cruce, No. 91-3274, 1992 WL 129611, at *1 (10th Cir. June 11, 1992).

20

The government also argues that permitting G'Ante to adopt Mr. Barnes's arguments by reference would allow him to circumvent word count rules. Aplee. Br. at 57. We agree with the Eighth Circuit that "[t]he Rules impose no limit on the volume of words one party may adopt" because "adoption of briefs will generally not cause the problems that word limits are designed to avoid, since courts and parties already have to read and respond to the briefs being adopted." In re Target Corp. Consumer Data Sec. Breach Litig., 855 F.3d 913, 916–17 (8th Cir. 2017). Thus, we exercise our discretion to permit G'Ante to adopt by reference the arguments in Mr. Barnes's brief.[3]

"We review de novo whether an offense qualifies as a crime of violence." United States v. Kepler, 74 F.4th 1292, 1300 (10th Cir. 2023).[4] Recall that the statute of conviction, 18 U.S.C. § 924(c), criminalizes use of a

---

[3] Because the arguments on this issue appear in the briefing in Mr. Barnes's appeal, all citations to appellant's and appellee's briefs in the remainder of this section refer to those in Mr. Barnes's appeal, United States v. Barnes, No. 24-3062. Citations to the record, however, refer to the record submitted in this appeal.

[4] At the district court, defendants' theory as to why § 111(b) is not a crime of violence differed from their argument on appeal. Aplee. Br. at 25–26. Below, they focused on the actus reus, arguing that § 111(b) is not a crime of violence because it does not criminalize forcible conduct. I R. 25–26. On appeal, they focus on the mens rea, arguing that § 111(b) is not a crime of violence because it can be committed recklessly. Aplt. Br. at 11–18. However, the district court reached the mens rea issue, holding that § 111(b) requires intent and cannot be committed recklessly. I R. 162–64. And "when the district court sua sponte raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court." United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1328 (10th Cir. 2003). Our review is therefore de novo.

21

firearm in furtherance of a crime of violence. I R. 656–57. G'Ante argues that forcible assault on a federal officer, 18 U.S.C. § 111(b), is not a crime of violence and therefore cannot serve as a predicate offense for his § 924(c) conviction. Aplt. Br. at 6.

This argument centers on the Supreme Court's decision in Borden v. United States, 593 U.S. 420 (2021). Aplt. Br. at 9–11. In Borden, the Supreme Court held that predicate "violent felon[ies]" under the Armed Career Criminal Act ("ACCA") only include offenses that criminalize intentional conduct. 593 U.S. at 429. If an offense can be committed recklessly, then it is not a "violent felony" under that statute. Id. We agree with the parties and the district court that the elements clause of the ACCA is "nearly identical" to the elements clause in 18 U.S.C. § 924(c). I R. 162; Aplee. Br. at 16 n.4; Aplt. Br. at 10 n.6. Thus, for § 111(b) to be a crime of violence, it must criminalize only intentional conduct. We hold that it does.

To decide whether an offense is a crime of violence, we apply the categorical approach. United States v. Baker, 49 F.4th 1348, 1355 (10th Cir. 2022). We "look[] only to the fact of conviction and the statutory definition of the prior offense, and do not generally consider the particular facts disclosed by the record of conviction." Id. (quotations omitted). If a statute is divisible — i.e., it defines more than one crime –– then the modified categorical approach applies. Descamps v. United States, 570 U.S. 254, 257 (2013). Under the modified categorical approach, we can "consult a limited class of documents, such as indictments . . . to determine which alternative

22

formed the basis of the defendant's prior conviction." Id.  Then, we apply the categorical approach and "compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." Id.

G'Ante argues that § 111(b) is not a crime of violence because it can be committed recklessly.  Aplt. Br. at 11–26.  We are not persuaded.  As the district court noted, this court already decided in United States v. Kendall, 876 F.3d 1264, 1271 (10th Cir. 2017), that § 111(b) is a crime of violence.  I R. 161–64.  In Kendall, we applied the modified categorical approach after determining that § 111 is divisible.  876 F.3d at 1269.  In concluding that § 111(b) is a crime of violence, we noted that "[t]he Supreme Court long ago explained that violating § 111 requires 'an intent to assault.'"  Id. at 1271 (quoting United States v. Feola, 420 U.S. 671, 684 (1975)).

As the district court here concluded, Kendall remains good law after Borden because Borden only removed offenses which can be committed recklessly from the ambit of crimes of violence.  I R. 163.  Indeed, we have relied on Kendall in post-Borden decisions for the proposition that "a 'conviction under § 111(b) necessarily requires a finding that the defendant intentionally used, attempted to use, or threatened to use physical force against the person of another.'"  United States v. Newman, No. 23-3120, 2023 WL 8520092, at *3 (10th Cir. Dec. 8, 2023), cert. denied, 145 S. Ct. 163 (Oct. 7, 2024) (quoting Kendall, 876 F.3d at 1270).  In Newman, we stated that "§ 111(b) requires a more culpable mens rea than mere

recklessness [and] satisfies Borden's definition of a crime of violence." Id. Other circuits to reach the issue after Borden have also held that § 111(b) is a crime of violence. United States v. McDaniel, 85 F.4th 176, 185–86 (4th Cir. 2023); United States v. Medearis, 65 F.4th 981, 987 (8th Cir. 2023). Absent en banc review or a contrary Supreme Court ruling, we are not at liberty to ignore Kendall. United States v. Edward J., 224 F.3d 1216, 1220 (10th Cir. 2000).

We are not persuaded by any of G'Ante's remaining arguments, including his reliance on United States v. Zunie, 444 F.3d 1230, 1235 (10th Cir. 2006); Aplt. Br. at 11–18. That case was decided before Kendall, and involves 18 U.S.C. § 113(a)(6), a different statute than the one at issue here. See Zunie, 444 F.3d at 1234–35. Other circuits have even recognized that Zunie is irrelevant to whether § 111(b) is a crime of violence. McDaniel, 85 F.4th at 187. Comparatively, at least one other circuit has cited Kendall in concluding that a § 111(b) conviction requires a mens rea higher than recklessness. Medearis, 65 F.4th at 987. Kendall remains good law after Borden and controls our decision in this case. In Kendall, we held that § 111(b) is a crime of violence. We therefore reject G'Ante's arguments to the contrary.

AFFIRMED.

24